**INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 13974.

United States Court of Appeals District of Columbia Circuit.

Argued April 11, 1958.

Decided June 12, 1958.

Burger, Circuit Judge, dissented.

Mr. M. E. Boiarsky, Charleston, W. Va., with whom Mr. Willard P. Owens, Washington, D. C., was on the brief for petitioners.

Miss Fannie M. Boyls, Atty., National Labor Relations Board, with whom Messrs. Thomas J. McDermott, Associate Gen. Counsel, National Labor Relations Board, and Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, were on the brief, for respondent. Mr. Stephen Leonard, Associate Gen. Counsel, National Labor Relations Board, at the time the record was filed, also entered an appearance for respondent.

Before FAHY and BURGER, Circuit Judges and MADDEN, Judge, United States Court of Claims.*

MADDEN, Judge.

The petitioners are the International Union, United Mine Workers of America, and District 17 and Local Union No. 2935 of the International Union. On April 12, 1957 the National Labor Relations Board issued its decision and order against all three of these unions. The unions have petitioned this court to review and set aside the Board's order. The Board has filed a request for the enforcement of its order. These proceedings are authorized by sections 10(e) and 10(f) of the Labor Management Relations Act 1947, 29 U.S. C.A. 160(e) and 160(f).

The Labor Board's decision was that the unions had violated section 8(b) (3) of the Labor Management Relations Act, 29 U.S.C.A. § 158(b) (3), known also as the Taft-Hartley Act, and hereinafter generally referred to as "the Act". Section 8(b) (3) makes it an unfair labor practice for a union which is the exclusive representative of employees to re-

---

* Sitting by designation pursuant to the provisions of Sec. 291(a), Title 28, U.S.Code.

fuse to bargain collectively with their employer.

The events giving rise to the instant controversy occurred in the early months of 1955. There was in effect at that time a contract known as the National Bituminous Coal Wage Agreement of 1950, as amended in 1952, between the International Union and an association of operators of coal mines, of which association the Boone County Coal Corporation was a member. Boone's mines were in West Virginia. At the mine involved in the instant proceeding it employed some 275 employees. Local 2935, one of the petitioners herein, included only these Boone employees. Boone was a member of the Kanawha Coal Operators Association, a group of West Virginia Coal Operators, one of the purposes of which was to deal with District 17, one of the petitioners herein, which was the International Union's West Virginia subdivision.

At the Boone mine, before the occurrences of January and February 1955, there was a disagreement between management and employees as to how seniority was to be applied to the filling of jobs which became available. There were about 40 laid-off employees who had seniority rights. In former years, when new machines requiring different skills had been installed, it had been the company's practice and policy to upgrade its employees and train them in the operation of the new equipment, rather than to hire new employees from the outside.

A new assistant mine superintendent came to the mine in October 1954. Apparently at his instance the mine management took the position that it was not running a training school and that it would not consider an employee on the working force or the idle panel as eligible for a job vacancy unless that employee could take over immediately, without additional training, the operation of the new equipment. By *ad hoc* arrangements with the employee's mine committee the company was allowed to hire men from the idle panel, without regard to seniority, on the ground that they were needed for particular jobs, but then the company would transfer them to other jobs for which senior employees on the idle panel were qualified. The men got the impression that the company was circumventing the seniority system in order to discriminate against older employees and negro employees.

In December 1954 the company was about to acquire two additional 11 BU Joy loading machines and the assistant superintendent let it be known that he intended to hire operators for these machines from the outside. There were employees who were experienced in operating loading machines, but not in operating this particular type of machine. The mine committee protested, urging that the new jobs could be filled by upgrading presently employed persons and then filling their places from the idle panel, as had been the company's practice and policy in past years. The company answered that the seniority article of the contract made no provision for such a step-up arrangement and that what the mine committee was proposing was an unwarranted infringement upon the rights of management.

After four meetings at the local level at which the problem was discussed, the company consulted the Kanawha Coal Operators Association, and was advised to consult District 17 before it acted. On January 20, 1955, Kennedy, the Executive Secretary of the Association telephoned to Farley, District 17's chief field representative, who said he would look into the dispute and let Kennedy hear from him. He had not done so by January 27. The company in the meantime hired two outside operators for the new loading machines. One of these new operators, John Libatore, reported for work on January 27. The men, including Bias, the president of Local 2935 and White, a member of the mine committee said that the men would not work if Libatore was put to work on the new machine. Libatore was put to work. The men went home. The strike continued until it was settled on Feb-

ruary 24. The men returned to work on February 28.

When the stoppage occurred on January 27, Mitchell, the assistant mine superintendent, telephoned Kennedy, and Kennedy telephoned Farley. There was an angry conversation. Out of the conflicting testimony of Kennedy and Farley it may be gathered that Farley took the position that the men were right in their complaints about company conduct, and refused to ask them to return to work. On February 2, the company sent telegrams to the presidents of the International, the District and the Local, requesting that the men be ordered to return to work and that the cases be processed under the settlement of disputes clause of the joint wage agreement. That agreement provided for conferences at various levels leading ultimately, if necessary, to arbitration by an umpire. The International answered suggesting that District President Blizzard was handling the dispute and that the company should contact him.

Neither the company nor the unions attempted to set up a meeting under the grievance procedure of the contract until February 10. On that date District President Blizzard visited the mine and arranged for a meeting between the mine committee and the management. There was such a meeting that day and another one the next day. There was misunderstanding about getting representatives of District 17 and the Kanawha Association to the meetings, and a further meeting was not held until February 24, on which date, at the request of District 17, District representatives met with Kanawha Association representatives, with company and Local 2935 representatives present. The meeting lasted five hours. Farley proposed·that the company be permitted to retain the two outside operators who had been hired, but that these two should train other employees in the operation of the new equipment; that the company undertake to follow in the future the practice it had pursued in earlier years of training employees on its working force in the operation of new equip-

ment instead of going to the outside for operators. At this point the company's General Manager Greenwald left the room with Kennedy of the Kanawha Association, and, after consultation, returned and made a statement. He said that in the past the company had made it a practice whenever possible to train employees in the use of new equipment and also to upgrade qualified men to higher rated positions. He said that it was the company's intent to follow that policy in the future. With specific reference to the new loading machines, he said that the company planned to put three such machines in operation, requiring a total of six operators, and that it was his intention to obtain the additional operators from inside the mine. It was then agreed that an employee who had been discharged at the beginning of the strike would be reinstated, and that when the Local had approved the settlement, the men would return to work. The settlement was approved by the Local and work was resumed on Monday, February 28.

The foregoing recital shows that a dispute arose between the company and the employees, that negotiations were had, largely at the instance of the representatives of the employees, that the negotiations resulted in a settlement of the dispute. Stated thus nakedly, this would look like collective bargaining at its best. Yet the company filed charges accusing the unions of refusing to bargain collectively, the Board issued a complaint pursuant to the charges, and issued an order directing the unions to cease and desist from refusing to bargain collectively.

The explanation for the apparent paradox is that the Board was of the opinion that the unions committed a breach of contract when the employees struck on January 27, 1955. Assuming that they did, that is not the end of the inquiry, because a breach of an employer-union contract is not, *per se*, an unfair labor practice. The legislative history of the Taft-Hartley Act shows that. As the bill was originally passed in

the Senate, it would have made it an unfair labor practice "to violate the terms of a collective bargaining agreement or the terms of an agreement to submit a labor dispute to arbitration." [1] But this proposal was rejected in the Conference, the House Conference Report stating:

"The Senate amendment contained a provision which * * * would have made it an unfair labor practice to violate the terms of a collective bargaining agreement or an agreement to submit a labor dispute to arbitration. The conference agreement omits this provision of the Senate amendment. Once parties have made a collective bargaining contract the enforcement of that contract should be left to the usual processes of the law and not to the * * Board." [2]

The Board has heretofore taken the position that it, the Board, "is not the proper forum for parties seeking to remedy an alleged breach of contract or to obtain specific performance of its terms." United Telephone Company of the West, 112 N.L.R.B. 779, 782. The Taft-Hartley Act in its section 301, 29 U.S.C.A. § 185 provided access to the Federal courts for suits for violations of collective bargaining contracts.

In the face of the legislative history just recited, it would seem that the Board has a heavy burden of persuasion that it does have authority to treat a violation of a term of a collective bargaining contract, even a term providing for the settlement of grievances by arbitration, as an unfair labor practice, and, in effect, decree its specific performance. It will be remembered that the rejected Senate provision expressly named agreements to submit labor disputes to arbitration as unfair labor practices.

In the instant case the Board held that the grievance and arbitration procedures set out in the "Settlement of Local and District Disputes" section of the contract excluded the right to strike over disputes cognizable under the grievance machinery, and that, therefore the strike was in derogation of the contract. The Board then said that the strike was an activity unprotected by the Act, and as such, occurring in a "bargaining context", it was violative of section 8(b) (3).

In the absence of a contract not to strike, a strike while collective bargaining is going on, and for the coercive purpose of obtaining a favorable bargain, is a rather ordinary occurrence and is not an unfair labor practice, though of course it occurs in a "bargaining context". The distinction between this situation and the instant one, in the view of the Board, was based on the Board's conclusion that the unions in the instant situation had agreed that they would not strike over grievances, but would rely exclusively upon the grievance procedure leading, if necessary, to arbitration. Hence, even if the difficulty, apparently presented by the legislative history, of making any breach of a collective bargaining contract an unfair labor practice were surmounted, it would still be necessary to find that there was, in fact, an agreement not to strike, the breach of which could be treated as an unfair labor practice.

The Board says, rightly, that a strike in violation of an agreement not to strike is an unprotected labor activity. The Supreme Court of the United States so held long before there was any legal provision for unfair labor practices by Unions. N.L.R.B. v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682. The Board has frequently so held. See, e. g., W. L. Mead, Inc., 113 N.L.R.B. 1040. Employees who strike in violation of such an agreement may be discharged, with impunity. However, to translate their conduct from an unprotected activity to an unfair labor practice one must find justification in the statute.

1. Legislative History of the Labor Management Relations Act, 1947, Vol. 1, p. 114.

2. Ibid., p. 545.

The Board's able Trial Examiner concluded that the unions here involved had bound themselves, by contract, not to strike over grievances. The Board agreed with that conclusion. The petitioners urge that the conclusion is not supported by the evidence. With deference to the Board and Trial Examiner, we agree with the petitioners.

The "legislative history" of the agreement in question is interesting and enlightening. The 1941 Appalachian Joint Wage Agreement plainly and expressly contained agreements not to strike. On July 8, 1947, the National Bituminous Wage Agreement of 1947 was executed. The Taft-Hartley Act, with its section 301 providing for suits by and against labor unions for breach of contract, had been approved on June 23 of that year. The 1947 agreement for the first time included a "Miscellaneous" article. Subsection 1 of that article rescinded all "no strike", "penalty", and "illegal suspension of work" clauses contained in earlier agreements. This was done to remove the danger that the union might be sued for breach of contract under the new statute. Subsection 3 of the "Miscellaneous" article said:

"3. The contracting parties agree that, as part of the consideration of this contract, any and all disputes, stoppages, suspensions of work and any and all claims, demands or actions growing therefrom or involved therein shall be by the contracting parties settled and determined exclusively by the machinery provided in the "Settlement of Local and District Disputes" section of this Agreement; or if national in character, by the full use of free collective bargaining as heretofore known and practiced in the industry."

In the same agreement the parties inserted a so-called "able and willing" clause providing that the agreement should cover the employment of persons "during such time as (they were) able and willing to work" in the coal mines. In Penello v. International Union, U.M. W.A., D.C., 88 F.Supp. 935, 938, 939, the District Court of this District, at the suit of the General Counsel of the N.L.R.B. in 1950 enjoined the International from insisting upon an "able and willing clause" in contracts it was then negotiating. The 1950 contract made after this decision of course eliminated the "able and willing clause".

The "able and willing" clause, as the Penello decision, supra, shows, was intended to permit the International Union and its President, John L. Lewis, to adjust the production of coal to the depressed market by closing mines at his discretion. It seems to have had no connection with the problem of "no strike" and "no stoppage" clauses. The Operators Negotiating Committee in 1950, in a letter written to Mr. Lewis in the course of the negotiation of the 1950 contract, demanded under heading (3) no strike or stoppage clauses, and under heading (4) the elimination of the "able and willing" clause. In the contract as agreed upon the "able and willing" clause was eliminated, but the contract made express provision, as had the 1947 contract, for the rescission of all "no strike", "penalty" and "illegal suspension of work" clauses. The 1950 agreement contained subsection 3 of the "Miscellaneous" article quoted above, and added, as subsection 4, an "integrity" provision as follows:

"4. The United Mine Workers of America and the Operators signatory hereto affirm their intention to maintain the integrity of this contract and to exercise their best efforts through available disciplinary measures to prevent stoppages of work by strike or lockout pending adjustment or adjudication of disputes and grievances in the manner provided in this agreement."

When the 1950 Wage Agreement was amended in 1952, Miscellaneous subsection 1, the rescission of "no strike" etc. provisions, as written in 1947, and continued in 1950, was left unchanged. The "best efforts" provision of subsection 4 had proved unsatisfactory to the union because it laid them open to criticism for

the measures which they took, or did not take, in disciplining locals or members who engaged in unauthorized stoppages. Subsections 3 and 4 were therefore combined into a new subsection 3, as follows:

"3. The United Mine Workers of America and the Operators agree and affirm that they will maintain the integrity of this contract and that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the "Settlement of Local and District Disputes" section of this Agreement unless national in character in which event the parties shall settle such disputes by free collective bargaining as heretofore practiced in the industry, it being the purpose of this provision to provide for the settlement of all such disputes and claims through the machinery in this contract provided and by collective bargaining without recourse to the courts."

From the above recited bargaining history must be deduced the meaning of the contract. Because of the danger of suits for breach of contract under section 301 of the Taft-Hartley Act, the International sought and was able to obtain, in the 1947 agreement, the unequivocal elimination of its former agreement not to strike. That was subsection 1 of the "Miscellaneous" article. Subsection 3, separated by some seven lines of print from subsection 1, contained, as we have seen, the provision that disputes should be settled exclusively by the machinery provided in the contract. Similar provisions appear in subsections 3 and 4 of the 1950 agreement, and in the combined subsection 3 of the 1952 agreement.

Did the parties expressly rescind the former "no strike" provisions in subsection 1 and reinstate them in section 3? They rescinded them in subsection 1 because of the danger of lawsuits under the Taft-Hartley Act. If they reinstated them in subsection 3, would the lawsuits be any less annoying or perilous to the union treasury? It is hardly conceivable that a stoppage of work could occur ex-

cept as a consequence of a dispute which would be cognizable under the grievance procedure of the contract. That being so, what was eliminated unequivocally in subsection 1 was restored completely in subsection 3, if subsection 3 was a "no strike" agreement.

If we are to credit the parties with normal capacity to reason and express themselves, we cannot read subsection 3 as a "no strike" agreement. The Board suggests that it isn't a complete "no strike" agreement; that the parties did not intend that the union should be subject to damage suits under section 301 if there should be strikes, but that they did intend that if the Labor Board should conclude that a strike in violation of a "no strike" agreement was an unfair labor practice, subsection 3 would be a "no strike" agreement for that purpose. This course of reasoning is difficult to follow. If one has disclaimed legal liability in connection with an otherwise promissory expression, it would seem that he means not merely that he should not be mulcted in damages in a court of law for failure to perform his promise, but that he should not be proceeded against for specific performance in a court of equity, or in a quasi-judicial tribunal whose orders are enforced in a court.

It may be urged that, just as subsection 1 would be nullified by treating subsection 3 as a "no strike" agreement, so section 3 would be nullified by treating subsection 1 as negativing a "no strike" interpretation of any provision of the contract. We sense in the Board's treatment of the problem a preference for an interpretation which results in a "no strike" agreement, if the writing is susceptible of such an interpretation. In International Brotherhood of Teamsters v. W. L. Mead, Inc., 1 Cir., 230 F.2d 576, and United Construction Workers v. Haislip Baking Co., 4 Cir., 223 F.2d 872, there are expressions which support the Board's preference. Such a preference is, however, no justification for, by the process of benevolent interpretation, making a contract for the parties which,

to a moral certainty, they did not make for themselves. Further, as to the problem of interpretation, section 13 seems to us to have a bearing. It says:

"Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right."

This section forbids a free interpretation of the Act itself in such a way as to find in it implicit inhibitions of the right to strike. It seems to us that the spirit of the section also is an admonition to deciding tribunals not to interpret ambiguous provisions of contracts as amounting to "no strike" agreements.

It is of course fair to ask what the court thinks subdivision 3 of the "Miscellaneous" article of the contract meant. We think it was, in effect, a "gentlemen's agreement" that the desirable way to settle disputes was by the use of the grievance machinery; that the responsible officials of the union hierarchy would do their best to see that that procedure was followed; that they would put such pressure as seemed to them to be wise and likely to be effective upon the members and the inferior echelons in the hierarchy to induce or coerce them to refrain from striking. It is likely that the agreement has been of great benefit to the operators and the union and that most disputes have been resolved by the use of the grievance machinery.

The Board points to instances in which officers of the Districts of the International, in urging the cessation of stoppages, told the strikers that they were violating the union's agreement and that they were not good union men because they were not living up to the contract. Such statements were not legal advice. They were statements as to the moral obligation of the union, and the damaging effect upon it of violations of that moral obligation. In the context and circumstances, they were just as appropriate to a gentlemen's agreement as to a binding legal obligation not to strike.

Earlier in this opinion we adverted to the serious question whether, in the light of the legislative history of the Taft-Hartley Act, any breach of contract could, merely as such, be regarded as an unfair labor practice. In view of our conclusion that the strike here in question was not a breach of contract, it is not necessary for us to decide the other question.

The petitioners urge that none of them had any responsibility for the strike; that it was a "wildcat" strike without union authorization. As to International and District 17, we are inclined to agree. As to Local 2935, our inclination is to the contrary. But we need not decide these questions, in view of our disposition of the case on another ground.

The petition to set aside the order of the Board is granted, and the Board's petition for enforcement is denied.

BURGER, Circuit Judge (dissenting).

I dissent because the record contains substantial evidence and rational grounds to support the Board's conclusion that the refusal to comply with contract grievance procedures was a refusal to bargain in good faith and constitutes an unfair labor practice. See note 1 infra.

The grievance dispute which gave rise to this case concerned the seniority clause of the contract; the contract explicitly provided that seniority grievances were to be disposed of by the grievance machinery established in the contract. The majority opinion rests its reversal of the Labor Board action on the ground that the collective bargaining contract *does not* contain an affirmative "no strike" clause, but it overlooks what the contract *does* contain, namely a solemn agreement by both parties to submit *all disputes* to an agreed process of negotiation leading finally to a binding arbitration if the preliminary steps are not successful. The mutual promises to settle all grievances by this peaceful process are plain and unambiguous, and this indeed is not disputed. Specifically the contract made provision for settling all grievance disputes first by discussion between the

aggrieved party and the mine management; if that failed, the second step was negotiation between the union mine committee and the mine management; the third step provided for negotiation between representatives of the union district and the mine operators' association; the fourth step was consideration by a four member board of union and management representatives; if all these preliminary steps were unsuccessful, the parties agreed to submit the dispute to an umpire, with a provision that "A decision reached at any stage of the proceeding shall be binding on both parties hereto and shall not be subject to reopening * * * except by mutual agreement."

I cannot accept the view of the majority that these explicit detailed contractual provisions represent merely a loose "gentleman's agreement" that the parties will *try* to resolve their problems without strikes or lockouts; to me they are the words of contracting parties who intend to set up binding provisions for what experience has taught is effective machinery for the day to day bargaining between management and employees. They are the words of enlightened union and management leaders who intend to abandon brutal and wasteful methods and substitute negotiation and arbitration as a means of settling disputes.

About December 10, 1954, the company advised the union of its desire to hire outside operators for new loading machinery due to the fact that there were no employees trained or qualified as operators. On December 14, the mine committee met with the management to protest the decision. Additional meetings were held between the parties during the next month without resolving the problem. On January 20th, the representative of the coal operators' association advised the union district office of the dispute and the latter promised to investigate it. The company then hired two operators, who had not previously been employees of the mine. The union went on strike January 27th, without ever attempting to employ the third and fourth and final steps of the contract grievance procedure. While the strike was in effect, there were various contacts and meetings between the management and a committee of the strikers as well as with the district representative of the union and the mine operators' association. The management finally yielded to the union's demand while the strike was in process and the men returned to work.

The position of the union is that it never agreed that it would refrain from striking during the process of bargaining or using the grievance machinery.

It seems clear to me that the presence or absence of a "no strike" clause is beside the point—the important factor is that the parties made an explicit agreement to settle disputes and grievances by a carefully worked out and prescribed process. A lockout, or a strike, without any real effort first to exhaust this contractual administrative machinery is clearly a violation of the contract. I think the majority does not dispute the fact that in this case one of the contracting parties was forced to "agree" to a solution under the coercive impact of two factors: (a) a refusal to carry out the contract provisions for peaceful settlement, and (b) a strike. Economic pressures such as strikes should, of course, not by any means be treated as an unfair labor practice per se, but when they are coupled with violations of explicit provisions to bargain and ultimately to arbitrate, it seems to me that it is within the power of the Board to hold that such conduct constitutes an unfair practice.[1]

1. The Board expressly found: "The Respondents by engaging in such unprotected activity [striking] in aid of their bargaining position not only abused their bargaining powers and impaired the collective bargaining process, *but also thwarted the peaceful procedures for the* *channelization of contract disputes that they had agreed to follow as a substitute for economic conflict. This, in our opinion constituted bad-faith bargaining contravening the Act's requirements.*" (Emphasis added.)

It must follow from the majority holding that an employer who uses coercive tactics such as a lockout accompanied by refusal to use contract grievance procedures and arbitration cannot be held guilty of an unfair labor practice. This corollary, which I wish to emphasize, is a dangerous one for unions and working men for it clearly implies that an employer who does not want to fulfill his agreement to settle disputes in accordance with the contract can, with impunity, lock out his employees until they yield to his position in a dispute. I think it violates the whole purpose and intent of collective bargaining to say that these coercive economic methods may be used by an employer, and of necessity I think the Board must be allowed the power to say that such pressure tactics in violation of express contract provisions are unfair practice whether resorted to by an employer or a union.

. In the Haislip case [2] the Fourth Circuit held that a strike was a breach of contract where the contract provided that "all disputes * * * shall be * * settled and determined exclusively by the machinery provided in the * * *" contract. The same conclusion appears to have been reached in at least three other Circuits.[3] Even the union appeared to consider the strike to be a violation of the contract.[4] I should emphasize that it is not the strike, standing alone, which I would regard as supporting the Board's finding of unfair labor practice and indeed we need not reach that question. Rather the failure of the union to carry out and follow the steps provided for in the contract for the resolution of grievance disputes, and indeed the repudiation of the contract, standing alone, seems sufficient to support the Board's finding of an unfair practice.

Section 8(d) plainly does not limit collective bargaining operations to particular negotiations for renewal of contracts. It explicitly defines collective bargaining as "the performance of the mutual obligation of the employer and the representative of the employees to * * confer in good faith with respect to wages, hours, and other terms and conditions of employment, *or* the negotiation of an agreement, *or any question arising thereunder* * * *". (Emphasis added.)

The Board had before it three factors, each of which it carefully analyzed before

2. United Construction Workers v. Haislip Baking Co., 4 Cir., 1955, 223 F.2d 872, 876, Parker, C. J., certiorari denied 350 U.S. 847, 76 S.Ct. 87, 100 L.Ed. 754; see, also, Hazel-Atlas Glass Co. v. N. L. R. B., 4 Cir., 1942, 127 F.2d 109.

3. International Brotherhood of Teamsters v. W. L. Mead Inc., 1 Cir., 1956, 230 F. 2d 576, petition for certiorari dismissed by stipulation 352 U.S. 802, 803, 77 S.Ct. 21, 1 L.Ed.2d 37; N. L. R. B. v. Dorsey Trailers, Inc., 5 Cir., 1950, 179 F.2d 589; N. L. R. B. v. Sunset Minerals, 9 Cir., 1954, 211 F.2d 224; accord, W. L. Mead Inc., 113 N.L.R.B. 1040, 36 L.R.R.M. 1392; Cox, Some Aspects of the Labor Management Act of 1947, 61 Harv.L. Rev. 274, 308 (1948).

4. The trial examiner stated: "There is extrinsic evidence in this record to confirm that [the union understood that such a strike was a breach of contract]. Thus William Blizzard, former president of the District, who was present at the contract negotiations and who signed the contract on behalf of District 17, when directly asked for his interpretation of the 'integrity' clause of the contract, testified:

"'That means that we will take our grievances up in accordance with the contract. In the case of a stoppage we will go and use our persuasion to get them back to work, to get the men *to comply with that contract* (emphasis supplied).

"Thus, too, in a letter in evidence written by George Titler, president of District 29, reference is made to a work stoppage at another mine, which, it is stated, was in 'violation of the contract.' Similarly, R. O. Lewis, present president of District 17, in a letter to members of another local dated September 2, 1955, officially requested the members of that local to terminate a work stoppage and to have their claims adjudicated in accordance with the contract machinery, stating, *inter alia*, that the work stoppage was 'in direct opposition to the provisions of the Bituminous Coal Wage Agreement.'"

coming to a conclusion. It considered the detailed facts of the strike; it considered in great detail the terms of the contract and extrinsic evidence which cast light on the intent of the parties; and finally it considered the governing statute. It concluded that the conduct of the union, in light of all the factors, constituted an unfair labor practice. It cannot be gainsaid that here was substantial evidence to support the findings of fact, and that the interpretations of the contract and the law were within rational bounds, even if we might have decided these questions another way, were it for us to decide them, which it is not.[5]

In N.L.R.B. v. Hearst Publications, Inc.,[6] the Supreme Court considered the Board's interpretation of the statutory term "employee," as well as its findings of fact, saying:

> "Rejecting the Board's analysis, the court [of appeals] independently examined the question whether the newsboys are employees within the Act, decided that the statute imports common-law standards to determine that question, and held the newsboys are not employees."[7]

In reversing the Court of Appeals, 9 Cir., 136 F.2d 608, the Supreme Court said, " * * * the Board's determination that specified persons are 'employees' under this Act is to be accepted if it has 'warrant in the record' *and a reasonable basis in law.*"[8] (Emphasis added.)

In N.L.R.B. v. Waterman S.S. Co.,[9] the Supreme Court reversed the Fifth Circuit and affirmed the Board, saying:

> "It is of paramount importance that courts not encroach upon this exclusive power [to find facts] of the Board if effect is to be given the intention of Congress to apply an orderly, informed and specialized pro-

cedure to the complex, administrative problems arising in the solution of industrial disputes."[10]

The Board action in this case plainly has "warrant in the record"—as to the facts—and also has a "reasonable basis in law," for it is consistent with the basic congressional purposes on collective bargaining. With all deference to the wide experience of Judges Madden and Fahy in this area of the law, I suggest their conclusion is completely at odds with the purpose of Congress in these statutes, namely the peaceful resolution of disputes by use of processes of negotiation rather than by brute force.

---

5. Brotherhood of Railway & S. S. Clerks, etc. v. Railroad Retirement Board, 1956, 99 U.S.App.D.C. 217, 223, 239 F.2d 37, 43; N. L. R. B. v. Waterman S. S. Corp., 1940, 309 U.S. 206, 60 S.Ct. 493, 84 L. Ed. 704.

6. 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L. Ed. 1170.

7. Id., 322 U.S. at pages 114–115, 64 S.Ct. 853.

8. Id., 322 U.S. at page 131, 64 S.Ct. 861.

9. 1940, 309 U.S. 206, 60 S.Ct. 493.

10. Id., 309 U.S. at page 208, 60 S.Ct. at page 495.