**LOCAL UNION NO. 9735, UNITED MINE WORKERS OF AMERICA, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 14030.

United States Court of Appeals District of Columbia Circuit.

Argued April 11, 1958.

Decided June 20, 1958.

Mr. M. E. Boiarsky, Charleston, W. Va., for petitioner.

Mr. Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, with whom Mr. Thomas J. McDermott, Associate General Counsel, National Labor Relations Board, Miss Fannie M. Boyls and Mr. William W. Watson, Attorneys, National Labor Relations Board, were on the brief, for respondent. Mr. Stephen Leonard, Associate General Counsel, National Labor Relations Board, at the time record was filed, also entered an appearance for respondent.

Before Fahy and Burger, Circuit Judges, and Madden, Judge, United States Court of Claims.[*]

FAHY, Circuit Judge.

Section 8(d) of the Labor Act[1] provides that where a collective bargaining contract is in effect the duty to bargain collectively shall mean that no party to the contract shall terminate or modify it without *inter alia* serving a written notice on the other party of the proposed termination or modification sixty days prior to the expiration of the contract.

A strike occurred in the winter of 1956 at a mine of the Westmoreland Coal Company in West Virginia. Prior to the strike none of the procedural requirements of section 8(d) were complied with by the Local Union at the mine. Holding that the strike was for the purpose of modifying the 1955 Agreement between the employer and the International Union, United Mine Workers of America, of which the Local was a member,[2] the Labor Board found that the Local, as agent of the International in this respect, had committed the unfair labor practice of refusing to bargain collectively within the meaning of section 8(b) (3) of the Act[3] and entered an order appropriate to such a finding.[4] 117 N.L.R.B. 1072. The Local petitions us for review of and to set aside the Board's Order insofar as it operates against the Local. The Board answers and requests enforcement.

The Local attacks the validity of the order on several grounds. It claims that it was not responsible for the strike; that it was not the agent of the International in carrying out the latter's bargaining function in respects pertinent to this case, and that it was not itself a party to the 1955 Agreement, the modification of which the Board found was its purpose in striking. We find it unnecessary to pass upon these questions because, assuming the correctness of their resolution by the Board adverse-

---

[*] Sitting by designation pursuant to the provisions of Sec. 291(a), Title 28 U.S. Code.

[1] 49 Stat. 452 (1935), as amended, 29 U.S.C. § 158(d) (1952), 29 U.S.C.A. § 158(d).

[2] The Agreement referred to as the 1955 Agreement is basically the 1950 contract known as "National Bituminous Coal Wage Agreement of 1950," amended and carried forward as the 1955 Agreement.

[3] 49 Stat. 452 (1935), as amended, 29 U.S.C. § 158(b) (3) (1952), 29 U.S.C.A. § 158(b) (3).

[4] The Board, in support of the proposition that a strike to modify a collective bargaining agreement without complying with section 8(d) is an unfair labor practice under section 8(b) (3), cites N.L.R.B. v. Lion Oil Co., 352 U.S. 282, 285, 77 S.Ct. 330, 1 L.Ed.2d 331; Mastro Plastics Corp. v. N. L. R. B., 350 U.S. 270, 285–286, 76 S.Ct. 349, 100 L.Ed. 309; United Elec. Radio & Machine Workers of America (UE), Local 1113 v. N.L.R.B., 96 U.S.App.D.C. 46, 50, 223 F.2d 338, 342; Boeing Airplane Co. v. N.L.R.B., 85 U.S.App.D.C. 116, 119, 174 F.2d 988, 991.

ly to the Local, nevertheless we think the order must be set aside upon the ground, as the Trial Examiner concluded, that the strike was not for the purpose of modifying the 1955 Agreement.

The strike arose in the following circumstances:

Paragraph 7 of the 1955 Agreement reads,

"7. In two or three shift operations the question of seniority with regard to work on the respective shifts shall be left to the discretion of the contracting parties at the mine in question."

Two employees, Curtis Hager and Hassell Woods, both on the third shift of a Westmoreland mine, claimed the right by reason of seniority to fill certain vacancies on an earlier shift. Their claims were rejected by the employer, who asserted no shift seniority pertained at the mine. Grievances were filed by Hager and Woods and were processed through the settlement procedures of the 1955 Agreement, eventuating in the decision of an umpire in favor of the employer.

The umpire said the question was "whether or not Curtis Hager and Hassell Woods are entitled to shift seniority," that "since shift seniority was not in effect at this particular mine, Curtis Hager and Hassell Woods were properly dealt with in this instance * * *." He pointed out that shift seniority is not always in effect at a mine "but simply in effect if agreed between management and the men at that particular mine; and the method of applying seniority where it is in effect is always set up at each mine." He found no evidence in the record of the grievance hearing that the company had agreed to put shift seniority in effect at this mine after paragraph 7 had been put into the contract.

Was the ensuing strike for the purpose of modifying the 1955 Agreement? It is clear the Agreement does not in terms provide for or preclude shift seniority; it leaves this to the discretion of the parties at each mine; and the umpire thought the evidence did not make out a separate agreement for such seniority at this mine. Obviously, then, the men struck against this decision of the umpire and not against paragraph 7 of the Agreement. Yet the finding of the unfair labor practice is not grounded on a strike against the decision of the umpire. The Board explicitly refused to pass upon the contention of its General Counsel that a strike against an umpire's award, binding pursuant to contract provisions, is an unfair labor practice under section 8(b) (3). See 117 N.L.R.B. at 1074 n. 4, and also the report of the Examiner, printed at 117 N.L.R.B. 1078, 1092.

The Board reasons, however, that the umpire's decision became a part of the contract—"at least with respect to the status of Hager and Woods," to borrow its language,—as if written into the Agreement, and so the strike was to modify this *nunc pro tunc* addition to the Agreement. But the court decisions relied upon by the Board for the proposition that an arbitrator's award becomes a part of the contract providing for the arbitration [5] we think are not applicable to this case because of paragraph 7 of the Agreement. That provision clearly contemplates that the parties may make separate arrangements at particular mines regarding shift seniority. Assuming that a strike against an umpire's decision respecting such seniority would be a violation of contractual provisions making such a decision binding, it would

5. Cracchiolo v. Carlucci, 62 Ariz. 284, 157 P.2d 352, 355, and Zelle v. Chicago & N. W. R. Co., 242 Minn. 439, 65 N.W.2d 583, 590–591, each quoting with approval from 3 Am.Jur., Arbitration and Award, § 154, that when an arbitration "award is made, it is read into the original agreement." And also Burns v. Thomas Cook & Sons, 317 Mass. 398, 58 N.E. 2d 150, 152; Pick Industries, Inc., v. Gebhard-Berghammer, Inc., 262 Wis. 498, 56 N.W.2d 97, 99, 57 N.W.2d 519; Levy v. Superior Court, 15 Cal.2d 692, 104 P.2d 770, 774, 129 A.L.R. 956.

not be a strike for the purpose of modifying the Agreement itself. It would be to obtain what paragraph 7 of the Agreement contemplates shall be a matter for separate agreement at each mine.

It may not in reason be said that after the umpire's decision the 1955 Agreement provided that Hager and Woods and all other employees at this mine could obtain shift seniority only by a modification of that Agreement. This is simply not the situation. For, assuming that Hager and Woods did not have shift seniority when the strike occurred, this was not because the 1955 Agreement deprived them of it but because no arrangements permitted by that Agreement had been made for such seniority at this mine. Thus the strike was not against the 1955 Agreement. The effort of the men by striking to obtain the shift seniority which the evidence shows they believed they had was an effort to obtain what the 1955 Agreement permitted them to seek.

Section 8(d) requires the retention of "all the terms and conditions" of an existing contract "without resorting to strike or lock-out" for a period of sixty days after notice to terminate or modify the contract is given. "Section 8(d) thus seeks during this natural renegotiation period, to relieve the parties from the economic pressure of a strike or lockout in relation to the subjects of negotiation." Mastro Plastics Corp. v. N.L.R.B., 350 U.S. 270, 286, 76 S.Ct. 349, 359, 100 L.Ed. 309. Section 8(d) does not apply, however, where the attempt is not to modify the terms of an agreement, ibid, cf. United Elec. Radio & Machine Workers of America (U. E.), Local 1113 v. N.L.R.B., 96 U.S.App.D.C. 46, 49–50, 223 F.2d 338, 341–342, but is to obtain an objective which the agreement has not settled. N.L.R.B. v. Jacobs Mfg. Co., 2 Cir., 196 F.2d 680, 683–684. Here the Agreement leaves the matter of shift seniority open. In striking to achieve such seniority the Local did not commit the unfair labor practice found by the Board.

The portions of the order of the Board which run against the Local accordingly are

Set aside.

BURGER, Circuit Judge (dissenting).

I dissent because here, as in International Union, United Mine Workers of America v. N.L.R.B.,[1] the majority is departing from well established limits on our scope of review of Board action and substituting its judgment for that of the agency which Congress established to administer the Labor Act.

Stripped of details not here pertinent, this record shows the employer and union made a contract covering various mines; the question of shift seniority was left to supplemental negotiation and agreement between each local at each mine. In one mine several employees demanded shift seniority. These demands were processed under the express provisions of the contract which called first for negotiation and finally for submission to the decision of a neutral umpire whose conclusion was to be final and binding on the parties. Thus the parties delegated to the umpire the power to resolve the point, i. e., to make their agreement for them. The neutral umpire decided against the contentions of the union. The union went on strike in protest. The obvious and undeniable object of the strike was to compel the employer to set aside the solution reached via the umpire's decision, and make a new agreement favorable to the union demand. Under the economic pressure of the strike the employer finally capitulated.

The Board found that this strike was an effort to compel the employer to modify the contract to conform with union demands as to shift seniority. The majority now holds the union may go on strike to compel the employer to amend or add to the existing contract to pro-

1. 103 U.S.App.D.C. 207, 257 F.2d 211.

vide for the desired shift seniority without complying with Section 8(d).

Paradoxically my colleagues say that "it [the strike] would not be a strike for the purpose of modifying the Agreement itself. *It would be to obtain what paragraph 7 of the Agreement contemplates shall be a matter for separate agreement at each mine.*" (Emphasis added.) The only way these two quoted sentences can be reconciled is to say that supplemental local agreements made during the term of the master contract, and relating to subjects which the master contract expressly leaves open to local agreement, do not become a part of the total contract between the parties. This is an artificial and strained interpretation utterly at odds with the facts and with experience in industrial relations.

Here the *total* collective bargaining agreement between the Local and the employer was to be the formal written contract or master contract *plus* whatever they locally agreed to do on shift seniority at each mine. It is a simple matter of elementary labor relations practice which I am sure my colleagues acknowledge, that master contracts are often supplemented by special or additional agreements which affect only one plant or one division. In this case the parties reached agreement on this supplemental aspect of their *total collective bargaining relationship* by letting a neutral third party resolve the point. My colleagues say that a strike to compel the employer *to add to the basic formal contract* what the union wanted by way of a shift seniority clause is not "a strike for the purpose of modifying the Agreement itself." To say that a strike to force *a particular clause or provision*[2] is not a strike to modify the agreement is hair splitting.

The majority in effect holds that when any *new* benefit or improvement *not then expressly covered by a contract* is sought by a union—or by an employer—while the contract is in effect, that new objective may be demanded and strikes and lockouts may lawfully be employed to coerce the other party to consent, even though the dispute *is expressly cognizable* under the grievance machinery or is of a kind normally subject to collective bargaining processes. To my mind this approach would put industrial relations back to the pre-Wagner Act status of "might making right." That this is a real danger to working men and unions, apart from its basic unsoundness, is suggested by the fact that at this very moment we are in a period where production exceeds consumer demand and ruthless employers may well use the majority holding as a weapon to secure "consent" of unions to demands and contract changes which they would not agree to in good faith, arm's length collective bargaining. This situation is illustrated by the following hypothetical case: A union contract calls for one day's paid vacation for each month of service not exceeding a total of two weeks for any employee. Jones works ten months and on July 1 makes a demand for ten-twelfths of the full two weeks paid vacation. The company refuses, claiming a practice which requires one full year's employment preceding the vacation period as a condition precedent to any vacation. The union demands and is accorded arbitration of the issue by a neutral umpire in accordance with contract provisions.[3] The umpire decides Jones is indeed entitled to a pro rata vacation taking into account the formal contract, practices of the plant and other factors stated in his finding. The employer announces this is a distortion of the contract and unless the un-

2. The strike was admittedly to accomplish two things, (a) set aside the umpire's award, (b) to compel the employer to add something to the contract which had been left open to be resolved by each local. They had bound themselves to accept the umpire's decision on this phase of their working conditions which then became *part of the total collective bargaining relationship.*

3. Normally contracts specify a minimum period of employment to qualify for a vacation. This issue, like shift seniority, is one which is within the purview of annual contract negotiations or arbitration processes.

ion alters the contract or agrees to his interpretation of it he will close the plant. Thereafter the employer locks out his employees, asserting he is doing so in protest against the umpire's award. Can it be said that this lockout is not an effort to amend and alter or reform the contract? The employer seeks to add conditions to the contract relating to qualifications for vacation rights which are not in the existing contract. A lockout to force the union to consent to the employer's "interpretation" of the vacation clause after the issue has been decided adversely to the employer in a binding arbitration is nothing less than a coercive subterfuge to accomplish *a change* in the contract.

We are not empowered to decide as in the first instance whether the conduct of the union was an effort to modify the existing contract, but narrowly whether the Board's decision has "warrant in the record" and a "reasonable basis in law." It seems clear to me that "warrant" and "basis" existed and that we are compelled to affirm.[4]

My colleagues agree with me that "the men struck against this decision" (of the neutral umpire), and that "a strike against an umpire's decision * * * would be a violation of contractual provisions making such a decision binding."

This being true, the very least this court should now do is remand the case to the Board for consideration and explicit findings on the point it did not reach, namely, whether a strike against the decision of a neutral umpire rendered under the contract arbitration clause is a breach of contract and an unfair labor practice. The Board's initial failure to pass on this issue is plainly not binding on us and orderly administration of the Act commands such treatment.

4. N.L.R.B. v. Hearst Publications Co., 1944, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170; N.L.R.B. v. Waterman S.S. Corp., 1940, 309 U.S. 206, 60 S.Ct. 493, 84 L. Ed. 704; Brotherhood of Railway & S.S. Clerks, etc. v. Railroad Retirement Board, 1956, 99 U.S.App.D.C. 217, 223, 239 F.2d 37, 43; Cf. Local 1976, United Broth. of Carpenters and Joiners of America, A.F.L. v. N.L.R.B., 78 S.Ct. 1011.