CHENEY CALIFORNIA LUMBER COM-
PANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 17677.

United States Court of Appeals
Ninth Circuit.

June 18, 1963.

Comfort, Dolack & Hansler, and John Hansler, Tacoma, Wash., for petitioner.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Marion Griffin and Stephen B. Goldberg, National Labor Relations Board, Washington, D. C., for respondent.

Before JERTBERG and MERRILL, Circuit Judges, and PENCE, District Judge.

MERRILL, Circuit Judge.

Cheney California Lumber Company, engaged in business in Greenville, California, filed with the National Labor Relations Board charges of unfair labor practices on the part of Local No. 2647 and the District Council of Lumber and Sawmill Workers. The Board dismissed the complaint, and Cheney has petitioned this Court for review of the Board's order. It contends that the Union's resort to strike constituted a failure to bargain in good faith, in violation of section 8 (b) (3) and (d) of the National Labor Relations Act (29 U.S.C. 158(b) (3) and (d)), and further constituted restraint and coercion of Cheney in the selection of its bargaining representative, in violation of section 8(b) (1) (B) of the Act (29 U.S.C. 158(b) (1) (B)).

The record shows that for many years labor relations between employers and unions in the lumbering and sawmill industry in Northern California have been carried on through multi-employer and multi-union bargaining. Petitioner was represented in this bargaining by Pine Industrial Relations Council (hereinafter called "Pine"). Local 2647, representing petitioner's employees, was in turn represented by the District Council of the Union.

A collective bargaining agreement, in effect between Cheney and the Local, was to expire April 1, 1958. On January 28, 1958, the Local gave petitioner notice of five proposed contract modifications, including a general wage increase, the establishment of a multi-employer health and welfare fund, a selected wage increase for certain job classifications, provision for additional paid holidays and the institution of union dues check-off. The Union designated the District Council as its bargaining representative as to all of these demands except the selective wage raise and check-off. Negotiations with Pine commenced. On April 11, 1958, the day following the first bargaining conference, notice of dispute was sent to the California State Conciliation Service and to the Federal Mediation and Conciliation Service. On April 30, 1958, the existing collective-bargaining contract was extended for a year, leaving open for negotiation, however, the Union's modification demands. The agree-

ment as extended contained a no-strike clause.

Thereafter, three further bargaining conferences were had between the District Council and Pine, the last occurring on September 6, 1958. The principal topic of discussion throughout the negotiations, and the Union's primary goal, had been an area-wide health and welfare plan. Pine had pointed out the fact that many employers were reluctant to enter into such a plan on an area-wide basis, and various alternatives had been proposed and explored. At the third Board meeting, Pine proposed either participation in a joint trust or provision for the same health and welfare plan on an individual employer-local basis. This was rejected by the District Council. At the final meeting Pine proposed an immediate wage increase and made no reference to any health and welfare proposal. This also was rejected by the District Council. Pine advised that it was not breaking off negotiations; that changing economic conditions in the industry might affect the employers' attitudes. It suggested further meetings. The District Council stated that it might feel compelled to deal forcefully with individual employers. Pine replied that it felt that coercion through strikes or strike threats would constitute an unfair labor practice.

The Union dealt no longer with Pine. On September 15, 1958, nine days after the last bargaining conference, it requested a meeting with petitioner, and the following day, in meeting with an officer of petitioner, it presented for signature a "joint recommendation," continuing the existing contract, but with specified modifications approved, including an area-wide health and welfare plan for Northern California. Petitioner's officer protested that bargaining authority had been given to Pine, whose representatives were not available that day; that he needed time to talk to other officers of petitioner; that he needed to know more about the health and welfare plan proposed; that the proposals changed provisions of the contract not left open for bargaining by the extension agreement then in effect.

The Union offered the Cheney representative an opportunity to contact Pine and other Cheney officials immediately on the telephone, but otherwise rejected these requests. The following day, September 17, 1958, the "joint recommendation" remaining unsigned, the Union struck petitioner's plant.

Petitioner contends that the Union's conduct constituted a failure to bargain in good faith.

Its position was sustained by the trial examiner in his intermediate report and recommended order. The Board reversed the examiner on all of petitioner's contentions and dismissed the complaint.

At the outset we note petitioner's suggestion that the Board did not accord to the trial examiner's report the deference to which it was entitled. The difference between the trial examiner and the Board was one of conclusion from practically undisputed facts. The trial examiner himself stated:

"There is practically no dispute between the parties as to the basic facts or the sequence of events which constitutes this controversy. Most of the evidence is documentary in form, and there is no substantial conflict in the verbal testimony of witnesses."

■■ The sole credibility finding of the trial examiner was in favor of a Union witness, and was not disturbed in any way by the Board. It also accepted all of the examiner's findings on the basic facts. In these circumstances, the examiner's conclusions, although they differ from the Board's, are not entitled to special weight. The Board was free to draw its own conclusions, turning as they did on matters other than credibility. N.L.R.B. v. Texas Independent Oil Company (9 Cir. 1956) 232 F.2d 447.

In three respects Cheney contends the Union has been guilty of improper conduct which, in legal effect, constituted per se a refusal to bargain in good faith.

First, Cheney assigns as improper the strike of September 17, 1958, which was resorted to by the Union in violation of a no-strike agreement.

■ While such a strike does constitute a breach of contract and is an unprotected labor activity, it does not follow that it constitutes an unfair labor practice. As pointed out in International Union, United Mine Workers v. NLRB (1958) 103 U.S.App.D.C. 207, 257 F.2d 211, 214–215, legislative history of the Taft-Hartley Act shows that it was not intended that violation of a collective-bargaining agreement should, per se, be held to be an unfair labor practice. Congress rejected such an unfair labor practice proposal. H.R.Rep. No. 510, 80th Cong., 1st Sess. 42 (1947); 1 Legislative History of the Labor Management Relations Act 114, 545–546. Section 301, 29 U.S.C. section 185, indicates that the federal and state courts, not the Board, are the proper forum for parties seeking to remedy alleged violations of collective-bargaining agreements. United Mine Workers, supra, 257 F.2d at page 215 points out that:

"The Board has heretofore taken the position that it, the Board, 'is not the proper forum for parties seeking to remedy an alleged breach of contract or to obtain specific performance of its terms.' "

Cf. Feinsinger, The National Labor Relations Act and Collective Bargaining, 57 Mich.L.Rev. 807 (1959).

In NLRB v. Insurance Agents' International Union (1960) 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454, it was held that a resort to unprotected labor activity, in the form of union slowdowns, does not per se constitute a refusal to bargain in good faith. The court states, 361 U.S. at pages 495, 496, 80 S.Ct. at page 430:

" * * * [T]he use of economic pressure by the parties to a labor dispute is not a grudging exception to some policy of completely academic discussion enjoined by the Act; it is part and parcel of the process of collective bargaining. * * * It may be that the tactics used here deserve condemnation, but this would not justify attempting to pour that condemnation into a vessel not designed to hold it."

■ In our judgment the fact that a strike, otherwise wholly consistent with good-faith collective bargaining, constitutes a violation of a no-strike agreement does not, per se, render the strike a refusal to bargain in good faith. Cheney has its remedy for damages resulting from this contract violation. Whether the conduct of the Union in calling the strike constitutes a refusal to bargain in good faith must be determined not on a per-se basis but upon a scrutiny of the circumstances taken in their entirety. This matter we shall consider later in this opinion.

■ Cheney next contends that the health and welfare plan as set forth in the "joint recommendation" presented for signature September 15, 1958, was lacking in the safeguards specifically required by section 302 of the Act, 29 U.S. C. § 186; that under that section it would therefore have been unlawful for Cheney to have signed it; that to demand Cheney's signature and to strike as a consequence of Cheney's refusal to sign an illegal provision constituted, per se, a refusal to bargain in good faith.

Section 302 makes it unlawful for an employer to pay or agree to pay money to his employees' representatives, save in certain specifically enumerated instances. Among these exceptions, subsection (c), is money paid to a trust fund established by the representative. To qualify as a trust fund under this exception, however, certain safeguards must be met, such as specific limitations in use of the fund, a specific detailing of the nature of the benefits, joint administration, annual audit, and a prohibition against the commingling of pension contributions with other funds.

There is no question that such safeguards were not spelled out in the description of the trust contemplated by

the Union's health and welfare plan as set forth in the joint recommendation.

The Board held, however, that an agreement on this proposal to create a trust fund in the future did not constitute the necessary agreement to pay under section 302, and that the Union, in demanding Cheney's signature, was not therefore demanding an unlawful act of Cheney.

We agree with the Board both in its interpretation of "agree to pay" and in its characterization of the joint recommendation. The purpose of the law is to "assure that welfare funds would be established only for purposes which Congress considered proper and expended only for the purposes for which they were established." Arroyo v. United States (1959) 359 U.S. 419, 426, 79 S.Ct. 864, 868, 3 L.Ed.2d 915. Although Congress was concerned with effectively preventing the misuse of moneys contributed to the funds by policing the agreements creating them rather than treating abuses after the fact, see, Cox, Some Aspects of the Labor Management Relations Act, 1947, 61 Harv.L.Rev. 274, 290 (1948), the Legislative history indicates that Congress intended to draw the dividing line at the agreements which brought the trust funds into actual existence rather than at contracts looking forward to the establishment of trust funds some time in the future.[1] The construction contended for by Cheney would lead to the result that neither party could generally commit itself in collective bargaining to the principle of a trust fund unless such commitment were to include detailed agreement upon the precise terms of the fund in its final form as specified in section 302(c) (5). Such a generalized commitment undertaken in order to resolve a labor dispute peacefully would automatically be equivalent to a failure to bargain in good faith, and the process of negotiation in this area—a delicate one as this case illustrates—would be seriously impeded. See Shapiro v. Rosenbaum (S.D.N.Y.1959) 171 F.Supp. 875, 878, n. 8.

Here the "joint recommendation," acceptance of which was demanded by the Union, constituted no more than a collective-bargaining proposal that a trust be established. It obviously contemplated that the trust details would be the subject of further negotiation, and committed Cheney only to the principle of a health and welfare plan operating through a trust arrangement.

We conclude that execution of the joint recommendation would not have been an unlawful act under section 302, and that this Union demand did not therefore constitute, per se, a refusal to bargain in good faith.

The notices of dispute sent by the Union to the Federal Mediation and Conciliation Service after the first bargaining conference, April 10, 1958, while dealing with the major subjects of proposed contract modification (health and welfare fund, general and selective wage increases and paid holidays, and checkoff of Union dues) did not expressly include changes in the contract's termination date and reopening provisions. The "joint recommendation" did include such matters.

Cheney contends that for the Union to strike in support of these demands, without having given notice of such demands in the manner required by section 8(d) (1)–(4) constituted a violation of that section and, per se, a refusal to bargain in good faith.

There can be no doubt, however, but that Cheney understood that the determination of these issues was included within the range of topics which, under the extension of April 30, 1958, remained open to negotiation. Both of these items were actually the subject of negotiation after April 30. Pine, itself, on September 4 and 6, had submitted written pro-

1. See 93 Cong.Rec. 4746–4747, 4753 (remarks of Senator Taft); 2 Legislative History of the Labor Management Relations Act 1310–1312, 1322. See also William Dunbar Co. v. Painters and Glaziers District Council No. 51 (D.C. Dist.Col.1955) 129 F.Supp. 417, 423.

posals for the settlement of these points. The Board noted that "as a practical matter bargaining about duration would seem necessarily to be incidental to bargaining about wage matters, for the duration of an agreement, including wage reopening, is a prime determinant in making and accepting wage offers."

The purpose of an 8(d) notice is to assure that strikes will not peremptorily be called in support of demands not submitted for negotiation.[2] Nothing surely would be gained by requiring further notices or cooling-off periods with respect to matters necessarily included in the subjects already embodied in notices and matters actually the subject of negotiation.

We conclude that refusal to bargain in good faith may not, for any of the reasons asserted by Cheney, be said to have been established per se.

▬▬ Refusal to bargain in good faith can be found not only as a matter of law through the commission of certain specific unfair labor practices, but also as a matter of fact through action which it may be said, upon appraisal of the over-all bargaining conduct, "reflects a cast of mind against reaching agreement." NLRB v. Katz (1962) 369 U.S. 736, 747, 82 S.Ct. 1107, 1113, 8 L.Ed.2d 230. The Board here has concluded from the facts that the Union's conduct did not, viewed in its entirety, constitute a refusal to bargain in good faith in the sense that it was "necessarily inconsistent with a sincere desire to conclude an agreement * * *." Katz, supra, 369 U.S. at 745, 82 S.Ct. at 1113. The question remains for us whether this determination is supported by the record.

Cheney urges that the conduct of the Union compels the conclusion reached by the trial examiner: that the Union's termination of negotiations with Pine and resort to strike, under the circumstances of this case, amounted to a refusal to bargain in good faith.

An issue, apparently regarded by all parties as controlling, was whether, at the time the Union broke off its negotiations with Pine, those negotiations had reached a state of impasse. The trial examiner concluded that they had not. The Board concluded that they had.

In our judgment the Board's conclusion is supported by reason. The area-wide health and welfare plan was the Union's prime objective. The Union was getting nowhere with Pine on this subject of negotiation. It had actually lost ground at the final bargaining conference with Pine, since Pine's last proposal was farther from the Union's objective than was the proposal made at the preceding conference.

The proper test for determining subjective good faith is not whether, judged on a basis of hindsight, an impasse has been reached as a matter of fact. What matters is whether the Union had reasonable cause to believe and did sincerely believe that an impasse had been reached. See generally, Cox, The Duty to Bargain in Good Faith, 71 Harv.L.Rev. 1401 (1958). With its objective apparently drifting farther away with each bargaining conference, the Union very well may have felt that further area-wide negotiation with Pine was a waste of time.

Under these circumstances it cannot be said that good-faith bargaining required the Union to continue dealing with Pine. It cannot be said that a resort to strike under these circumstances demonstrated a cast of mind against reaching agreement. The facts that bargaining with Pine had gone on for five months, and that the Union appeared to be losing ground would seem to establish quite the contrary: that it was reasonable to believe that an agreement could only be reached through dealing directly and individually with the employers, and through resort to economic pressures in connection with such dealing.

2. See NLRB v. Lion Oil Co. (1957) 352 U.S. 282, 289, 292, 77 S.Ct. 330, 1 L.Ed. 2d 331; Mastro Plastic Corp. v. NLRB

(1955) 350 U.S. 270, 284, 76 S.Ct. 349, 100 L.Ed. 309.

Cheney further contends that bad faith on the part of the Union is demonstrated by its peremptory refusal to allow Cheney sufficient time to consult with Pine and acquaint itself with the problems with which Pine theretofore had dealt.

It should be noted that if resort to strike was justified by a bargaining impasse, the Union need not have given Cheney any additional time at all. Further, although designating Pine as bargaining agent, Cheney had retained ultimate contracting authority with full freedom to accept or reject Pine's recommendations. From Pine's reports at bargaining conferences it was to be assumed that Cheney had been kept fully advised, and that it was Cheney and the other employers who were rejecting an area-wide health and benefit plan. The Union's final direct approach to Cheney was a call upon Cheney to exercise its contracting powers, and not an invitation to further negotiation.

We recognize that a close case is presented—one in which, as a matter of hindsight, it may well be said that the Union could, through resort to less peremptory action, have achieved its objectives and avoided, for its members as well as Cheney, the economic consequences of a strike. Nevertheless, for the reasons stated, we conclude that there is justification for the Board's determination that the over-all bargaining conduct of the Union did not amount to a refusal to bargain in good faith.

█ Finally, apart from the problem of good-faith bargaining, Cheney contends that the Union's conduct amounted to a coercion of Cheney in the selection of its bargaining representative, in violation of section 8(b) (1) (B).

The Board found that the strike was an economic one, with the sole objective of achieving the desired contractual terms, and was not based upon a refusal to deal with Pine. The finding is supported by substantial evidence. The Union had dealt with Pine for fifteen years. It continued to deal with Pine,

during and after the strike, in order to secure settlement.

Under these circumstances the Union's conduct did not constitute coercion under section 8(b) (1) (B).

The relief sought by petitioner—modification of the Board's order to comply with the recommendations of the trial examiner—is denied.