Sidney L. BRENNAN, Appellant,

v.

UNITED STATES of America,
Appellee.

Eugene J. WILLIAMS, also known as
Gene Williams, Appellant,

v.

UNITED STATES of America,
Appellee.

Jack J. JORGENSEN, Appellant,

v.

UNITED STATES of America,
Appellee.

Gerald P. CONNELLY, also known as
Jerry Connelly, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 15557–15560.

United States Court of Appeals
Eighth Circuit.

Jan. 21, 1957.

Writ of Certiorari Denied April 8, 1957.
See 77 S.Ct. 718.

Edward Bennett Williams, Washington, D. C. (Thomas A. Wadden, Jr., Agnes A. Neill, Washington, D. C., Elmer J. Ryan, St. Paul, Minn., Benedict S. Deinard, Melvin H. Siegel, and Thomas O. Kachelmacher, Minneapolis, Minn., were with him on the brief), for appellants.

Clifford Janes, Asst. U. S. Atty., St. Paul, Minn. (George E. MacKinnon, U. S. Atty., Kenneth G. Owens, and Allen I. Saeks, Asst. U. S. Attys., St. Paul, Minn., were with him on the brief), for appellee.

Before GARDNER, Chief Judge, VOGEL, Circuit Judge, and HARPER, District Judge.

GARDNER, Chief Judge.

Appellants were indicted, tried and convicted on an indictment charging them with a conspiracy to violate the Labor Management Relations Act under section 371, Title 18 U.S.C. and with violations of the Labor Management Relations Act, sections 186(a), (b) and (d), Title 29 U.S.C.A. Count I of the indictment charged a conspiracy between appellants and Gerald J. Connelly and George J. Rutman to violate certain provisions of section 186(b), Title 29 U.S.C.A. which makes it unlawful for any representative of any employees who are employed in an industry affecting commerce, with certain exceptions not here material, to receive or accept from the employer of such employees any money or other thing of value. Gerald J. Connelly and George J. Rutman, although charged as being co-conspirators with appellants, were not indicted.

Count II of the indictment charged that the Archer-Daniels-Midland Company paid $1,000 each to appellants Brennan, Williams and Jorgensen and that such payment was aided and abetted by appellant Connelly and by James W. Moore. Count III of the indictment charged that appellant Brennan accepted $1,000 from the Archer-Daniels-Midland Company, while counts IV and V of the indictment charged Williams and Jorgensen respectively with accepting like amounts from the same source. There is no material conflict in the evidence as appellants offered no evidence.

At all times pertinent to the issues here involved Archer-Daniels-Midland Company was a corporation and James W. Moore was its vice-president. It was engaged in processing various types of oil and operated a linseed oil plant in Minneapolis, Minnesota, employing approximately five hundred employees. The employees were classified as production workers and as over-the-road truck drivers. The production workers for collective bargaining purposes were represented by United Mine Workers and the over-the-road truck drivers were represented by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. In March of 1953 the production workers went out on strike at the Archer-Daniels-Midland Company mill. They were demanding a wage increase and a pension plan. Strike negotiations were at first handled on behalf of the company by one Arnold W. Williams, its Director of Industrial Relations, who was later replaced by James W. Moore, a vice-president, and James Akehurst, an assistant vice-president of the company, who thereafter assumed active control of all negotiations on behalf of the company.

Appellant Connelly approached George J. Rutman, president of Sta-Vis Oil Company, one of Archer-Daniels-Midland Company's suppliers, and asked him to arrange a meeting between himself and

James W. Moore. Such arrangement having been made, Connelly thereafter met with Moore and Akehurst on numerous occasions. Shortly after the first meeting between them the officials of both the company and the Minneapolis Teamsters met at a luncheon. At these meetings a plan was evolved to end the strike through a back-to-work movement by having the production workers overthrow their strike leaders and return to their jobs, notwithstanding the United Mine Workers Strike Committee, and then the Teamsters, through a new Local, and the company would formalize the contract, the terms of which were arranged at these meetings, covering all production workers. It was also agreed at these meetings that $5,000 would be paid appellants for effecting this, through the appellant Connelly. It was the thought of these negotiators that the United Mine Workers could not successfully oppose such a contract recognition of the Teamsters by the company because the United Mine Workers had not filed the non-Communist affidavit required by the National Labor Relations Act and, hence, was ineligible to appear on any National Labor Relations Board election representation ballot. It was believed that by this plan the United Mine Workers' hold on the company's employees would be broken and its place taken by the Teamsters. Connelly stated and represented that the Teamsters "had the plant" and that in the planned back-to-work movement the Teamsters would cross the United Mine Workers' picket lines.

About the time the arrangements to pay the $5,000 were made and while the strike continued, the Teamsters began to increase their activity in organizing Archer-Daniels-Midland Company's employees. Also about this time a general organizational meeting of Teamsters personnel was convened at appellant Williams' Minneapolis bar and he invited some of the Mine Workers Negotiating Committee to his bar where they discussed the Archer-Daniels-Midland Company strike situation. Appellant Jorgensen who had recently accomplished a shift of union affiliation to the Teamsters of employees of another large employer also met with some of the Mine Workers' leaders and on May 18, 1953, the back-to-work movement was attempted but failed.

On May 26, 1953, in response to a prior request by Moore, George J. Rutman mailed a check for $5,000 on behalf of Archer-Daniels-Midland Company to Gerald J. Connelly, the son of appellant Connelly, in Chicago, Illinois. The check was drawn payable to "National Sales Representatives", a fictitious, non-existent organization. Young Connelly deposited the money in a new bank account which he had opened for the sole purpose of handling the payment and simultaneously drew and mailed to Minneapolis separate $1,000 checks payable to appellants Brennan, Williams and Jorgensen respectively and a $900 check to appellant Connelly. The balance he retained for himself. "National Sales Representatives, by Gerald J. Connelly" appeared as maker on each of the checks. Each appellant cashed his check.

The strike was settled on June 3, 1953, by agreement between the company and the United Mine Workers and all production workers returned to their jobs. The Teamsters, however, were not successful in switching the production workers to their union and the company's over-the-road truck drivers continued throughout to be covered by a contract with the Teamsters union.

During 1953 and 1954 appellant Brennan was first vice-president of the International Brotherhood of Teamsters, secretary-treasurer and one of the business agents of Teamsters Local 544, vice-president of Teamsters Joint Council 32 and a board member of the Central States Conference of Teamsters. His name was listed as a member of the negotiating committee of the Central States Drivers Council by virtue of his position as an International vice-president. During 1953 and 1954 appellant Williams was recording secretary of Teamsters Local 544 and he also served

as a business agent for Local 544, in which capacity he negotiated contracts and settled grievances for the Local. Appellant Jorgensen belonged to Teamsters Local 359 and during 1953 and 1954 he served as president of the Teamsters Joint Council 32. He was also chairman of the miscellaneous division of the Central States Conference of Teamsters and a member of the National Policy Committee of the National Teamsters Warehouse Conference. Local 544 was affiliated with the International Brotherhood of Teamsters and with Teamsters Joint Council 32. Joint Council 32 was an organization composed of twenty to twenty-three Teamsters locals. The Central States Conference of Teamsters was composed of all local Teamsters unions in twelve middle western states, including Minnesota. It was divided in various divisions and the Central States Drivers Council was one of those divisions.

To determine the authority of the appellants Brennan, Williams and Jorgensen to represent the employees of Archer-Daniels-Midland Company recourse must be had to the Constitution of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers and to the constitutions and by-laws of the various Teamsters organizations. The powers conferred by the constitutions and by-laws of the various Teamsters organizations involved are summarized in the government's brief as follows:

"Much of the power and authority of Teamster officials is conferred by the Constitution of the Teamsters International. All local unions are chartered thereunder and constitute a part of the larger organization. As a matter of contract they agree to abide by the International Constitution. Local union 'representation' in International conventions is regulated; a payment of dues and taxes is required as a requisite for representation. The President of the International has broad powers of supervision and ap-pointment and upon request of a local union executive board may direct a referendum vote by the local union. He is given broad judicial power to decide questions of law and to settle and determine all grievances submitted by subordinate unions and bodies. Disobedient local unions may be punished by the General Executive Board and may be suspended and lose all privileges. The President may compel local unions to arbitrate and he is given broad power to determine eligibility for strike benefits. Local union by-laws are subject to his approval and he has wide power to appoint trustees to take possession of local unions and deprive the membership of self-government in union affairs. Moneys received from local unions are deposited to the credit of the Teamsters International and powers not vested in officers are vested in the General Executive Board. The General Executive Board may deny union membership and may try and punish union members on certain charges. Initiation fees, dues and per capita taxes are imposed and must be paid under penalty of suspension. Local unions are required to submit to audit by the International and when local unions are suspended the books, money and property of the local must be turned over to the International in trust.

"A local union cannot engage in a strike, lockout, boycott or lawsuit without notifying the local Joint Council which may approve or disapprove such contemplated action, and the President may also pass on the Joint Council action. Striking without recognition may result in loss of financial benefits and the President and General Executive Board may declare an end to financial aid to a strike.

"Wage contracts proposed by local unions must first be submitted to the Joint Council and be approved by the General President. Local un-

ions must affiliate with and pay dues to the area Joint Council. The Joint Council has 'judicial powers' to try local union cases and are authorized to establish Grievance Committees.

" 'All local unions within jurisdiction of the joint council shall affiliate with the joint council, *comply with its laws, and obey its orders.*'

\* \* \* \* \*

"Area Conferences may be established by the General Executive Board and be subject to 'supervision and control' of the International. Local unions must affiliate with and participate in Conference activities as ordered by the General Executive Board, and for disobedience with any such order may be disciplined.

"Local union members and officers may be tried on charges of violating the International Constitution by the Local Executive Board and no local union may make any by-law in *conflict* with the 'laws' of the International.

"The Central States Conference of Teamsters, according to its constitution, consists of locals and joint councils in twelve mid-west states. It is an organic body within the International subject to the supervision and control of the International.

" 'All local unions in the area \* \* \* shall become affiliated with and shall be fully obligated to recognize and abide by the Constitution of this Conference, its by-laws and any orders, directions or decisions appropriately issued by the Conference.'

"Disobedience authorizes discipline. The basis of 'representation' of each local union is specified. Conference delegates consist only of employed officers or business agents of local unions or joint councils. Local and joint council business agents are *automatically* elected as delegates. International officers and Conference organizers and 'representatives' are privileged as regularly credentialed delegates. The Conference Chairman is appointed by the International President. Local unions must present their proposed wage contracts to the Joint Council and to the Conference."

After careful consideration of the record we adopt and approve this summary as our own.

At the times covered by the indictment the over-the-road truck drivers were covered by a collective bargaining contract between Archer-Daniels-Midland Company as employer and the Central States Drivers Council and Teamsters Local Union 544 as the collective bargaining agents, and Local 544 and the Central States Drivers Council were acknowledged as the "exclusive representatives of all employees" covered by the contract. The contract was the master form of contract which was generally in existence between employers and Teamsters unions in the mid-west area accomplished through the Central States Drivers Council. The facts may be further developed in the course of this opinion.

When the government rested its case appellants interposed a motion for judgment of acquittal, which motion was denied. The appellants introduced no evidence but rested on the government's proof. The case was submitted to the jury on instructions to which appellants saved certain exceptions to be hereinafter considered. The jury returned a verdict finding defendants guilty as charged in the indictment. Defendants Moore and Archer-Daniels-Midland Company perfected appeals but thereafter voluntarily dismissed the appeals taken by them. From the judgments of guilty entered by the court on the verdict of the jury appellants prosecute this appeal seeking reversal on substantially the following grounds: (1) the court erred in denying appellants' motions for judgments of acquittal, (2) the prosecution should have been compelled to elect between Count One and Count Two as to appellant Connelly, (3) the court erred in denying appellants' motion for a mistrial after the statement of Paul C.

Thomas and in denying appellants' motion for exclusion of the jury during the testimony of Gerald J. Connelly, (4) the court erred in denying appellant Connelly's motion for a mistrial after the introduction of evidence tending to establish the commission of an independent crime by him and (5) the court erred in giving certain specified instructions and erred in refusing to give certain specified requested instructions.

The provisions of the Labor Management Relations Act, 1947, as amended, under which appellants were prosecuted and convicted on the substantive counts of the indictment, so far as here pertinent, read as follows:

"(a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce.

"(b) It shall be unlawful for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value.

\* \* \* \* \*

"(d) Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor and be subject to a fine of not more than $10,000 or to imprisonment for not more than one year, or both." Section 186, Title 29 U.S.C.A.

It was the chief contention of defendants at the trial of this case that defendants Brennan, Williams and Jorgensen were not representatives of the employees of Archer-Daniels-Midland Company and that the term "representative" as used in the statute should be construed to mean only labor organizations or individuals designated by employees as the exclusive bargaining representatives of the employees and did not include union officers. On this appeal, however, it is argued that the evidence was insufficient, not because the named defendants were not the bargaining representatives of the employees of Archer-Daniels-Midland Company, but because the evidence did not establish facts from which guilty knowledge on their part might properly have been inferred by the jury. Thus, it is argued that there was no substantial evidence that appellants knew that they were representatives of any employee of Archer-Daniels-Midland Company, that there was no substantial evidence that appellants knew that the sums received by them emanated from Archer-Daniels-Midland Company, that there was no substantial evidence that any officer or agent of Archer-Daniels-Midland Company knew that any sums emanating from Archer-Daniels-Midland Company would be paid to appellants Brennan, Williams or Jorgensen, that there was no substantial evidence that appellants agreed to receive or accept any sums from any source and that there was no substantial evidence that either appellant Williams or appellant Jorgensen was a representative of any employee of Archer-Daniels-Midland Company.

In view of the fact that the jury found the defendants guilty as charged in the indictment the evidence must be viewed in a light most favorable to the government, and the government, as the prevailing party, is entitled to the benefit of all such favorable inferences as may reasonably be drawn from the facts proven, and if, when so viewed, reasonable minds might reach different conclusions as to the facts, then the question of the guilt or innocence of the defendants became one of fact to be determined by the jury and not one of law to be decided by the court. It is not our purpose to indulge in a detailed analysis or recital of the varied, complicated and numerous facts and circumstances proven in this case further than as already set forth in this opinion. As has been observed, Brennan was an International vice-president, Jorgensen and Brennan were members of the Executive Board of Teamsters Joint Council 32 in Minneap-

olis and were its president and vice-president respectively, Brennan and Jorgensen were delegates and Williams an alternate delegate to the Central States Conference of Teamsters, Brennan and Williams were officials of Teamsters Local 544 and on the Executive Board of that local, and Brennan, Williams and Jorgensen all occupied other internal positions in the Teamsters organization.

It is urged that it was not incumbent upon the government to prove guilty knowledge because the offense charged was *malum prohibitum* but assuming that proof of guilty knowledge was essential, guilty knowledge or intent is usually a question of fact to be determined by the jury. The condition of the mind is rarely susceptible of direct proof but it depends upon many factors. It may be inferred from outward acts and attending circumstances. All appellants participated in various negotiations in cooperation with representatives of Archer-Daniels-Midland Company in a plan to break the strike of the production employees of the company then in progress. They knew the objects and purpose of the plan. During the progress of this plan they received $5,000 circuitously conveyed to them under suspicious circumstances. They retained the money, accounting for it, if at all, in a manner to conceal the purpose for which and the source from which it had been received. When the $5,000 was divided they accepted checks from a nonexistent organization of which they could never have previously heard. The proven facts and the attending circumstances, which we have carefully considered, unerringly point to the conclusion that the defendants had guilty knowledge, and the attending circumstances are not only consistent with that hypothesis but are inconsistent with the hypothesis that they were without guilty knowledge. Under this condition of the evidence the jury was, we think, warranted in inferring that they had such knowledge and, hence, were guilty as charged in the indictment.

It is next contended that the government should have been compelled to elect between counts I and II as to appellant Connelly, and it is urged that he could not properly have been convicted for both giving and receiving the same money at the same time and that "It was clearly the intent of Congress to punish givers under subsection (a) and receivers under subsection (b). It was clearly not the intent of Congress to punish givers for violating subsection (a) and also for conspiring with the receivers, or aiding and abetting them, to violate subsection (b); nor was it the intent of Congress to punish receivers for violating subsection (b) and also for conspiring with the givers, or aiding and abetting them, to violate subsection (a)." In support of this contention appellants cite and rely upon Gebardi v. United States, 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206; Nigro v. United States, 8 Cir., 117 F.2d 624, 133 A.L.R. 1128; and the dissenting opinion in May v. United States, 84 U.S.App.D.C. 233, 175 F.2d 994, but these authorities are readily distinguished. Unlike the cited cases there is here no affirmative legislative policy to exempt a person not a recipient representative who aids and abets paying in violation of section 186(a), Title 29 U.S.C.A. nor a person not an employer who conspires with others to have such other representative receive in violation of section 186(b), Title 29 U.S.C.A. The act specifically provides for the punishment of employers who are payers under section 186(a) and for the punishment of representatives of employees who are receivers under section 186(b). The teaching of the cited cases is to the effect that it is only when a person is the paying employer or recipient representative, one or the other, that the statute prohibits prosecution for aiding and abetting a conspiracy with the other. Count I of the indictment is not drawn under section 186(b), Title 29 U.S.C.A. but under the conspiracy statute, section 371, Title 18 U.S.C. and a conspiracy is a crime distinct from the object of the conspiracy and punishable as such. Marx

v. United States, 8 Cir., 86 F.2d 245; Brown v. United States, 8 Cir., 167 F.2d 772. In the instant case Connelly committed separate offenses by conspiring with the recipient representatives and aiding and abetting the paying employer and he was so charged and it was not error to deny his motion to require the government to elect between counts I and II. The evidence conclusively showed that Connelly both conspired with Brennan, Williams and Jorgensen in the scheme to receive, and that he aided and abetted Archer-Daniels-Midland Company in making the payment by innumerable meetings at which he counseled with them and even went so far as to cause his own son to act as a further intermediary. Manifestly, count II requires proof of additional facts not required by count I and, hence, there were two separate offenses. United States v. Johnson, 7 Cir., 235 F.2d 159, and there is no reasonable basis for requiring an election under Rule 8(a). Federal Rules of Criminal Procedure, 18 U.S.C. At most, in the circumstances here disclosed, the motion was addressed to the sound judicial discretion of the court and in the absence of an abuse of such discretion the ruling of the court will not be reversed. Pierce v. United States, 160 U.S. 355, 16 S.Ct. 321, 40 L.Ed. 454; Pointer v. United States, 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208.

During the course of the trial appellants interposed several motions for mistrial. George J. Rutman, who was charged as a co-conspirator but not indicted, was called and sworn as a witness on behalf of the government. In the presence of the jury his counsel made the following statement:

"Mr. Rutman is named as a co-conspirator in one or more counts of the indictment and as such I have advised him that anything he may say here tends to violate his constitutional rights and would tend to incriminate himself of a federal offense, and consequently, I have advised him to refuse to answer any questions except as to his name, and address. If the Court wants authorities in point I can give a case identical in point in California. The law is well stated, in the Kiewel case in Minnesota, which is the last expression in this state, a Federal Court case. It's obvious, Your Honor, that if he is a conspirator anything he says that may be used to convict the defendants he is at the same time convicting himself. You couldn't have any more of a perfect case, as a matter of fact, and he hasn't been indicted; he has no reason to think he won't be indicted and that if these defendants were indicted that there wouldn't be a clamor to indict him. He spoke very freely before the Grand Jury and cooperated to the utmost, but nevertheless, I have no alternative but to advise him in that manner."

Following this statement by counsel for this witness the matter was discussed before the court out of the presence of the jury and the court asked the witness a few questions which were not objected to and the witness was thereupon excused. Counsel for defendants then moved for a mistrial and it is urged that the statements by counsel for this witness were tantamount to a statement that the testimony of the witness would incriminate the witness as well as all the defendants. The only claim on behalf of the witness was that his testimony would tend to incriminate *him*. There was no claim that his testimony would tend to incriminate the other defendants, in fact, it might well have been supposed that his testimony would have been such as to show that he, and not the appellants, was guilty of the offense charged. The court properly instructed the jury to disregard the statement by counsel for the witness. This motion was addressed to the sound discretion of the court and in the absence of an abuse of such discretion its ruling will not be reversed. Emery v. United States, 8 Cir., 127 F.2d 561. We think there was no abuse of discretion and no prejudice to appellants.

■■ Following the foregoing incident the government announced that it would call Gerald J. Connelly as a witness, whereupon counsel for defendants requested the court to exclude the jury and determine outside the presence of the jury whether the witness would invoke the protection of the Fifth Amendment. This request was denied and the witness was sworn. The witness was asked only identifying questions and questions seeking to elicit whether or not "National Sales Representatives" was a corporation. He declined to answer on the ground that his answers might tend to incriminate him and he was thereupon excused without having given any material testimony. There was no attempt to elicit from this witness any testimony which might in fact have tended to incriminate him, nor was any inquiry made as to why the witness thought his answers might tend to incriminate him. The trial judge has the duty to supervise, direct and control the proceedings in his court and his rulings on these matters will not be reversed in the absence of a clear abuse of discretion. It is not apparent to us that any prejudice could have resulted to appellants by the action of the court in denying the request of counsel for defendants to exclude the jury while the witness was being interrogated as to whether or not he would invoke the protection of the Fifth Amendment.

■ One Paul C. Thomas was called as a witness on behalf of the government and without objection testified that he had told certain officers of the Archer-Daniels-Midland Company that:

"* * * Mr. Rutman had informed me on the Friday afternoon previous, after he appeared before the Grand Jury that he had reason to believe that he was to be called again on the next Monday or Tuesday and interrogated as to whether or not he had made any payments to anyone—to Mr. Connelly other than the $300.00 which had been made by his cousin, Joe Rutman, on behalf of the Barrel & Drum Association."

Not only was this testimony received without objection but there was no motion to strike it from the record, but later and just before the witness was cross-examined by counsel for defendants a motion was made for mistrial, on the ground that the quoted testimony was evidence of an independent offense and, hence, was inadmissible. The questions propounded to this witness disclosed the nature of the testimony sought to be elicited. It was therefore incumbent upon defendants to object to its admission, and having failed to do so they cannot now complain. There was no abuse of discretion in denying this motion for mistrial.

At the close of the final argument of the government's counsel, counsel for defendants moved for a mistrial because of certain statements made in the course of the closing argument. In order to fairly appraise the conduct of government counsel's remarks here objected to, it is necessary to consider certain statements made by counsel for defendants in their arguments, to which, it is claimed by counsel for the government, the closing arguments were in the nature of a reply. Counsel for defendants in their arguments, among other things, charged government counsel with "shabby conduct" in introducing evidence with respect to the back-to-work movement when trucks were brought across the picket line. They also argued that if defendants were convicted they would also be convicting "their children to grieve and shame", that the government had not tried the case fairly because the United States Attorney had heard witnesses say what he wanted to hear them say rather than what they actually said and that the United States Attorney had been unfair to Moore at the Grand Jury in not warning him and in remaining silent when it became obvious that Moore and Archer-Daniels-Midland Company were going to reimburse Rutman. It was also said in the closing argument of counsel for defendants:

"Tomorrow you are going to take this case out to your jury room to

begin deliberations. On these deliberations may hinge the liberty and reputations of five men. What you do in your jury room tomorrow will be the most important thing in the world to these five people. All of their hopes, all of their training, their aspirations of a lifetime ride on what you do in that jury room. Perhaps also the hopes and aspirations of five families ride on it. So I say it is a most important thing in the world to them. When your work is done here the prosecutor will go on to new cases. His Honor will try new litigation. The lawyers will busy themselves with other cases. You will return to your everyday lives. But the effects of what you do in your jury room tomorrow will live with these five men for all of their lives, and even though perhaps on Thanksgiving of 1956 this experience will be the dimmest in your recollection, it will be a very real thing to them, because the consequences of your decision will be felt by them always. I ask you only to approach your duties with that sobering thought."

It was apparently in reply to this very strong appeal that government counsel, among other things, said:

"Well we have been here a long time. It isn't any more pleasant to the Government than it is to anybody else, but we have a duty to perform too. We have sat here, defense counsel representing their clients state their contentions; the Court instructs you on the law; the Government puts in the case, and I think our responsibility is probably the easiest because when you go out, we have given you all the facts, our obligation is at an end, and you, as has been pointed out, have a continuing duty. You are jurors. You are exercising one of the highest duties and obligations of citizenship.

"Heretofore you have read about labor racketeering in the papers. You have read about some rather aggravated cases maybe, this is a case that touches in that field. As has been brought out, the FBI has brought a lot of witnesses here, a lot of evidence. They work on these cases. They will work on these cases in the future. Heretofore you may have read about convictions or acquittals and you might have said to yourselves, well, why was that man acquitted? How can they stop things like that when they have a guilty man and the evidence is presented to them if they don't bring in a guilty verdict in accordance with the evidence? Now that's why we are here, to weigh the evidence on the charge that's been returned here by the Grand Jury. Now, in the future you are going to hear probably more about labor racketeering, and you should, as I would feel, would want to feel in these cases when they arise in the future, that if you feel that the evidence here presents a case of guilt of the defendants or any of them that you acted in conformance with your duty when you were charged with that responsibility, and that you brought in a verdict in conformance with the law and the evidence. That and that only is the way that labor racketeering can be stopped because no law is any better than the jury called upon to enforce it. Every law gets down to whether a jury, when evidence of guilt is present, will bring in a verdict according to the law and the evidence, and I present to you and I submit that the Government has proved in this case that each of these defendants is guilty beyond a reasonable doubt."

 The argument of counsel, generally speaking, should be confined to the evidence that has been produced and to such inferences as may reasonably be drawn therefrom. There is, however, another field which may be explored by counsel and that is argument of opposing counsel, and where that argument goes beyond the normal field to be considered

opposing counsel may not be held strictly accountable if by reason of this provocation he approaches dangerously near the line of demarcation. Baker v. United States, 8 Cir., 115 F.2d 533; Chicago & N. W. Ry. Co. v. Kelly, 8 Cir., 84 F.2d 569; Myres v. United States, 8 Cir., 174 F.2d 329. Considerable latitude is allowed counsel, particularly in meeting argument of opposing counsel and we do not think the argument here objected to has transgressed the legitimate limits of advocacy. Mellor v. United States, 8 Cir., 160 F.2d 757; Stassi v. United States, 8 Cir., 50 F.2d 526. We conclude that the court did not err in denying all motions of defendants for a mistrial.

■ The trial court in instructing the jury gave an instruction on the scope and meaning of the word "representative" as used in the statute. It reads as follows:

"The word 'representative' in Section 186 of the National Labor Relations Act and elsewhere in any of my instructions is used in its ordinary every-day meaning and means a labor representative. As such, it includes any person who is empowered, authorized, or designated in any way, directly or indirectly, by any employee or employees, to represent such employee or employees in any matter relating to their wages or hours or working conditions by standing in the place of such employee or employees in any responsible dealing with the employer involving such matters.

"If a person be so authorized to act it is not necessary that he actually exercise all or any of the powers conferred upon him. Representative as used in this Act may also include one who is empowered, authorized or designated by any employee or employees to represent any employee or employees in any negotiation with their employer for the establishment of a new union and its recognition by such employer as a representative of said employees in any matter relating to their wages, hours, or working conditions.

"Any labor organization, such as a local union, union council, union conference or international union which is empowered, authorized or designated by any employee or employees to act on his or their behalf in any dealing with the employer with respect to hours, wages or working conditions is by virtue thereof a representative of such employee or employees, and any individual who actively holds and occupies an office or position of responsibility in any such union local, council, conference, or international, who is empowered or authorized in such office or position to act for any such labor organization in which he holds office in such way as to affect any such employee in a substantial way in any dealing with the employee's employer with respect to hours of labor, wages or working conditions, is thereby also a representative of such employee or employees."

The objections to this instruction were bottomed on the teaching of the opinion in United States v. Ryan, 2 Cir., 225 F.2d 417. On appeal, however, this decision of the Second Circuit was reversed and we think the instruction here under consideration is a correct pronouncement of the applicable law as decided by the Supreme Court in United States v. Ryan, 350 U.S. 299, 76 S.Ct. 400, 404.

■ Defendants requested two instructions which were refused and this is urged as reversible error. The first of these instructions reads as follows:

"You are instructed as a matter of law that a reasonable mistake of fact is always a defense in a criminal case. If you find that the Labor Defendants, or any one of them, made a reasonable mistake of fact in not knowing of the presence of Teamsters at the Archer-Daniels-Midland Co. plant, covered by a contract between Archer-Daniels-Mid-

land Co. and Local No. 544, it is your duty to return a verdict of not guilty as to them or him."

There was no affirmative evidence indicating that any mistake had been made. The defendants did not take the witness stand and there is no claim of mistake. Aside from this the court instructed that full knowledge was essential and, hence, there was no necessity to assert the negative. Instructions must be read as a whole and in this connection the court instructed fully as to ignorance of fact. Thus, the court in its instructions said, inter alia:

"An act committed or an omission made under an ignorance or mistake of fact, which disproves any criminal intent, is not a crime."

We think the court did not err in declining to give this requested instruction. Defendants also requested an instruction as to knowledge of their representative status and knowledge of the source of the sums in question. This instruction reads as follows:

"You are instructed as a matter of law that the burden is upon the prosecution to prove beyond a reasonable doubt not only that Archer-Daniels-Midland Company paid money that ultimately went to the Defendants Brennan, Williams and Jorgensen, but also the burden is upon the prosecution to prove beyond a reasonable doubt that Brennan, Williams and Jorgensen knew at the time they received the money that it was being paid by Archer-Daniels-Midland Company or on behalf of it. If the prosecution has failed to meet this burden with respect to these Defendants or any one of them, it is your duty to return a verdict of not guilty with respect to them or him."

Again, reading the instructions as a whole we think the court fully and fairly instructed the jury as to knowledge. The requested instruction is not, we think, a correct statement of the law relative to the proof of a conspiracy such as is alleged in count I of this indictment. The vice of this request is that it required the jury to find the commission of the substantive offense in order to convict on the conspiracy charge and it entirely overlooks the fact that the offense charged in count I is a separate and independent offense. We are convinced that there was no prejudicial error in the instructions as given. In this connection it should be observed that the Supreme Court in United States v. Ryan, supra, held that these pertinent sections of the law appear to be "a criminal provision, *malum prohibitum*, which outlaws all payments, with stated exceptions, between employer and representative." It is doubtful therefore whether it was necessary to prove evil intent other than that the payment was willfully made by the employer and willfully received by a representative of the employees.

We have considered all other contentions urged by appellants and think them entirely without merit.

Appellants were ably represented at the trial of this case and on appeal, and on consideration of the entire record we think appellants had a fair and impartial trial. The judgments appealed from are therefore affirmed.