**Louis M. SHAPIRO, Plaintiff,**

v.

**Samuel R. ROSENBAUM, as Trustee under Trust Agreements dated December 14, 1948, December 20, 1948 and January 1, 1954, and Radio Corporation of America, Defendants.**

**A. Edward MORRISON, Plaintiff,**

v.

**Samuel R. ROSENBAUM, as Trustee under Trust Agreements dated December 14, 1948, December 20, 1948 and January 1, 1954, and Columbia Broadcasting System, Defendants.**

**Joseph GOLD, Plaintiff,**

v.

**Samuel R. ROSENBAUM, as Trustee under Trust Agreements dated December 14, 1948, December 20, 1948 and January 1, 1954, and Decca Records, Inc., Defendants.**

**Pearl GAYNOR, Plaintiff,**

v.

**Samuel R. ROSENBAUM, as Trustee under Trust Agreements dated December 14, 1948, December 20, 1948 and January 1, 1954, and Loew's Incorporated, Defendants.**

United States District Court
S. D. New York.
Feb. 25, 1959.

Louis Kipnis, New York City, for plaintiff, Joseph Gold.

Morris J. Helman, New York City, for plaintiff, A. Edward Morrison.

Israel Beckhardt, New York City, for plaintiff, Louis M. Shapiro.

Charles Rosenthal, New York City, for plaintiff, Pearl Gaynor. (Israel Beckhardt, Lee Schrieber and Isadore H. Cohen, New York City, of counsel).

Arthur W. Lichtenstein, New York City, of counsel, Bernice Schwartz, intervening plaintiff.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, for defendant, Samuel R. Rosenbaum, Trustee. (Theodore Kiendl, George A. Brownell, William R. Meagher and James A. Thomas, Jr., New York City, of counsel).

Rosenman, Goldmark, Colin & Kaye, New York City, for Columbia Broadcasting System, Inc. (Lawrence R. Eno, and Alan Schwarz, New York City, of counsel).

Irving Greenfield, New York City, for Loew's Incorporated. (Joseph Macchia, New York City, and Jacob A. Weinstein, of counsel).

Cahill, Gordon, Reindel & Ohl, New York City, for Radio Corporation of America. (John W. Nields, New York City, of counsel).

Cohen & Sandomire, New York City, for Decca Records, Inc. (Edgar M. Rubin, New York City, of counsel).

GIGNOUX, District Judge, serving by assignment.

These are stockholders' derivative actions challenging the legality under Section 302 of the Labor Management Relations Act, 1947 (the Taft-Hartley Act) (29 U.S.C.A. § 186) of certain Trust Agreements entered into in 1948, 1954 and 1959 between the corporate defendants (hereinafter called the "Record Companies") and the defendant Samuel R. Rosenbaum, as Trustee (hereinafter sometimes called the "Trustee"). The Trust Agreements were executed as part of the consideration for certain Labor Agreements executed in 1948, 1954 and 1959 by each Record Company, individually, with the American Federation of

Musicians (hereinafter called the "AF M").[1] By stipulation, the four actions were tried together. Although each action involves a different one of the Record Companies, all actions challenge the legality of the same agreements on the same grounds.

Plaintiffs claim that the payments made by the Record Companies to the Trustee pursuant to the Trust Agreements are payments to a "representative of employees" prohibited by Section 302. Each plaintiff seeks a decree restraining the Trustee from making further payments out of the Trust Funds and restraining the Record Companies from making further payment to the Trustee under the Trust Agreements. In their original complaints, the plaintiffs also sought decrees requiring the Trustee to restore to each Record Company the amounts paid by it to the Trustee since the establishment of the original Trust on December 14, 1948.[2] However, during the course of the trial, and without objection, the Court entered its Order dismissing the claims against the Trustee for restitution of these sums. There thus remain for consideration only the prayers for injunctive relief.

The Trust Agreements involved in this case are the following: (1) an agreement between certain manufacturers of phonograph records and the Trustee dated December 14, 1948; (2) an agreement between certain manufacturers of electrical transcriptions [3] and the Trustee dated December 20, 1948; (3) an agreement between certain manufacturers of phonograph records and the Trustee dated January 1, 1954; (4) an agreement between certain manufacturers of electrical transcriptions and the Trustee dated January 1, 1954; (5) an agreement between cer-

tain manufacturers of phonograph records and the Trustee dated January 1, 1959; and (6) an agreement between certain manufacturers of electrical transcriptions and the Trustee dated January 1, 1959.[4] The material terms of all six agreements are in most respects the same. The Trust Funds so created are collectively known as the Music Performance Trust Fund.

The Labor Agreements pursuant to which the Trust Agreements were executed are separate collective bargaining agreements entered into between each Record Company, individually, and AFM, in 1948, 1954 and 1959. The provisions of the 1948, 1954 and 1959 Labor Agreements, insofar as material to these proceedings, are substantially identical. Each provides that the execution of the related Trust Agreements is one of the considerations for the Labor Agreement.

The statute involved in this case is Section 302 of the Taft-Hartley Act. It provides in material part as follows:

> Section 302. Restrictions on payments to employee representatives * * *.
>
> (a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value *to any representative of any of his employees* who are employed in an industry affecting commerce.
>
> (b) It shall be unlawful *for any representative of any employees* who are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value.
>
> * * * * * * *

1. As of the date of hearing, the defendant Loew's had not executed the 1959 Labor Agreement with AFM.

2. As of June 30, 1958, the aggregate amount of the payments so made was approximately $23,000,000.

3. An electrical transcription is a sound reproduction manufactured for broadcasting use.

4. As of June 30, 1958, there were 1,668 signatories to the 1948 Trust Agreements and 2,258 signatories to the 1954 Trust Agreements, of which 717 were also signatories to the 1948 Trust Agreements. The defendant Record Companies are signatories to both Trust Agreements.

(d) Any person who willfully violates any of the provisions of this section shall, upon conviction thereof, be guilty of a misdemeanor * * *.

(e) The district courts of the United States * * * shall have jurisdiction * * * to restrain violations of this section * * *.[5] (Emphasis supplied.)

■ The section also provides, in subdivision (c), that payments may be made to a "representative of employees" under certain statutory exceptions, including payments to employees' welfare funds, which are to be administered by a group of trustees equally representative of employers and employees.[6] It is conceded, however, that the agreements in question do not come within any of the statutory exceptions. It is also conceded that the employees of the Record Companies are employed in an industry affecting commerce. The only issue before this Court, therefore, is whether the payments to the Trustee under the Trust Agreements constitute payments to a "representative of employees"[7] prohibited by the Statute.[8]

The issue thus presented requires an examination of the background of the Trust Agreements; the conferences and negotiations leading to the execution of the Trust Agreements; the circumstances surrounding the selection of the Trustee; the terms of the Trust Agreements; the terms of the Labor Agreements; and the Trustee's administration of the Trusts. The evidence in this respect establishes the following history:—

(a) The Background of the Trust Agreements.

For some years prior to 1942 the AFM felt that the commercial use of recordings was resulting in wide-scale unemployment of musicians. Consequently, in 1942 the members of AFM, under the leadership of James C. Petrillo, its President, ceased to play for recording purposes. The ensuing work stoppage was ended in 1943 and 1944 by collective bargaining agreements which were entered into between AFM and the Record Companies.[9] Pursuant to these agreements the Record Companies paid to AFM approximately 1% of the suggested retail sales prices for records utilizing the services of AFM members. The fund so col-

---

5. "Serious doubts" have been voiced as to whether Section 302(e) vests any independent jurisdiction in the federal District Courts. See Copra v. Suro, 1 Cir., 1956, 236 F.2d 107, 115. At least one case has held that it does not. Moses v. Ammond, D.C.S.D.N.Y.1958, 162 F.Supp. 866. However, the Court does not consider this question since, in any event, jurisdiction of the instant proceedings is clearly conferred by 28 U.S.C.A. § 1337. Moses v. Ammond, supra, at 872.

6. § 302(c) (5). 29 U.S.C.A. § 186(c) (5).

7. Actually Section 302 prohibits payments by an employer to a "representative of any of *his* employees". (Emphasis supplied.) The record clearly establishes that AFM is the representative of musicians employed by the Record Companies. For simplicity, the issue is stated as in the text.

8. In closing argument, the plaintiffs for the first time advanced the extraordinary contention that the Record Companies' promises to execute the Trust Agreements, as contained in the Labor Agreements, themselves constituted agreements to pay or deliver something of value to the AFM as a representative of employees, and were, therefore, unlawful under Section 302. Although the issue is plainly not raised by these pleadings, the Court will state that it considers such a contention to be patently without merit. Plaintiffs' position in this respect could only be sustained by a construction of Section 302 which would abolish collective bargaining by making illegal every employer's promise to a union which contemplated a benefit to anyone, including the employer's own employees. Such a construction finds no support whatsoever in the language, the legislative history or any prior judicial interpretation of the effect of the Taft-Hartley Act.

9. The pattern for these agreements was set by the defendant, Decca, which signed in late 1943. The defendants Columbia and RCA followed in 1944. The defendant Loew's did not sign an agreement until after its entry into the recording industry in 1946.

lected was termed the Recording and Transcription Fund of AFM and was expended, under the exclusive direction and control of AFM, for payments to musicians for live performances given free to the public. Allocations from the fund were made on a *per capita* basis to AFM's 700 Locals in the United States and Canada. The total amount collected by the Recording and Transcription Fund was approximately $4,500,000, substantially all of which was expended in the three years 1947, 1948 and 1949.

In 1947 the Taft-Hartley Act was enacted. The Record Companies were advised that Taft-Hartley had rendered illegal further payments to AFM under the existing agreements, and terminated such payments as of December 31, 1947. As a result, AFM members ceased making recordings on January 1, 1948.[10] There followed a second work stoppage which continued into December, 1948.

(b) The Conferences and Negotiations Leading to the Execution of the Trust Agreements.

In an effort to bring the work stoppage to an end, a committee of employers in the recording industry was formed in early 1948 and attempted to work out a solution. As a result of meetings of this committee and of negotiations with AFM, a draft of the 1948 Record Trust Agreement was developed. The purpose of the proposed agreement was, concededly, to provide for the employment of instrumental musicians by an independent trustee to be selected by the Record Companies, who would administer the trust in such a manner as to avoid the prohibitions of the Taft-Hartley Act. The original draft of the agreement was prepared by AFM. Upon its submission to the industry committee, the committee advised that the Record Companies would consider the plan only if its legality were approved by their counsel, by the Department of Justice and by a leading member of the Republican Party.

Counsel for the Record Companies having approved the plan,[11] a copy of the proposed trust agreement, together with a copy of the proposed form of the 1948 Labor Agreements, was submitted by the Record Companies for the approval of the Attorney General of the United States on November 10, 1948, and, with modifications suggested by the Attorney General, was resubmitted for the approval of the Secretary of Labor in early December, 1948. Accompanying both submissions was a memorandum summarizing the essential terms of both agreements and setting forth their background substantially as here related. At the same time, similar submissions were made to Senator Robert A. Taft, a leading Republican and principal author of the Taft-Hartley Act.

On the day upon which the plan was submitted for his approval, Senator Taft advised that in his opinion it would not violate either the letter or spirit of the Taft-Hartley Act, and on December 13, 1948, the Secretary of Labor notified the Record Companies that the legality of the proposed trust and labor agreements had been approved by the Solicitor of the Department of Labor and the Attorney General.[12] The 1948 Phonograph Record

---

10. The Record Companies were notified of AFM's intentions in late October, 1947, by identical letters from Mr. Petrillo.

11. The plan was also approved by John W. Davis, Esq., counsel for Guaranty Trust Company of New York, which had been approached by the Record Companies with a view to its appointment as trustee in the event the plan was approved. Guaranty subsequently declined to serve as trustee because of the administrative problems involved.

12. The Opinion of the Solicitor of the Department of Labor was in the form of a memorandum to the Secretary of Labor, dated December 10, 1948. After reviewing the relevant provisions of the agreements and of the Act, it concludes as follows:

If the Trustee should in fact become a representative of employees by his own actions, it would, of course, be a breach of the Trust Agreement. In this connection I am informed that the recording companies have already indicated their choice of a trustee, who from the information available appears to be an individual unaffiliated with the Federation

Trust Agreement and the 1948 Labor Agreements were executed on December 14, 1948. The 1948 Electrical Transcription Agreement was executed on December 20, 1948.

### (c) The Circumstances Surrounding the Selection of the Trustee.

The defendant Rosenbaum was selected as Trustee by the Record Companies early in December, 1948, and his choice was approved by the AFM.[13] The Department of Labor and the Attorney General were notified of Mr. Rosenbaum's tentative selection prior to their approval of the legality of the plan.

The record discloses that Mr. Rosenbaum had never been at any time affiliated with the AFM, nor had he ever been associated in any capacity with any labor union, any labor union representative or any group of employees. Mr. Rosenbaum was, and is, a distinguished attorney at law, a member of the Pennsylvania Bar, and engaged in the private practice of law in Philadelphia. Prior to his selection as Trustee, he was a director of Litt

Bros., a large department store in Philadelphia, and was president of its subsidiary radio station, WFIL. He had acted as chairman of the Labor Committee of the National Association of Broadcasters. In that capacity, and also as chairman of a group of independently-owned radio stations, he had conducted negotiations, representing the broadcasters, with the AFM in 1937 to avert a strike. Mr. Rosenbaum had been, and remains, active as a sponsor and supporter of cultural musical enterprises. Among other activities, he has been since 1928 a director of the Philadelphia Orchestra Association and during a ten-year period prior to 1948 had been its vice-president. His only connection with labor relations has been as a representative of employers.[14]

### (d) The Terms of the Trust Agreements.

The material terms of the Trust Agreements are in most respects the same. They provide for the payment by the Record Companies to the Trustee of

---

capable of discharging his duties impartially and effectively.

Under all the circumstances it is my opinion that the Trust Agreement does not conflict with the Labor-Management Relations Act, 1947.

The Opinion of the Attorney General was submitted to the Secretary of Labor in response to a letter from the Secretary of Labor, which enclosed copies of the agreements and accompanying memorandum filed by the Record Companies, together with the Solicitor's memorandum of December 10. It concludes:—

I think we are entitled to assume that these agreements will be carried out in good faith, according to their terms. On that assumption, and on the basis of the careful consideration which has been given to the matter in this Department as well as in the Department of Labor, I am prepared to express my agreement with the conclusions reached by your Solicitor.

13. Mr. Frank B. Walker, vice-president of Loew's Inc., first suggested Mr. Rosenbaum's name at a meeting of the industry committee at which AFM was not present. Mr. Walker notified AFM of Mr. Rosenbaum's proposed choice by a telephone call to Mr. Petrillo. Mr. Pe-

trillo's reply was, "If he is all right with youse guys, he is all right with me."

14. The evidence discloses the following additional biographical details of Mr. Rosenbaum's life and activities. He was born in Philadelphia in 1888. He attended the University of Pennsylvania and received his A.B., LL.B. and LL.M. degrees prior to the first World War. He also studied at the Middle Temple Inns of Court in London. In 1916 he was retained by Dean Wigmore as drafting counsel for the American Judicature Society to draft a model code of civil procedure. During World War I, he drafted the War Risk Insurance Act, 40 Stat. 398, and the Soldiers and Sailors Civil Relief Act of 1917, 40 Stat. 440. From 1920 to 1924 he served as an assistant city solicitor for the City of Philadelphia. From that time until 1943 he was engaged in the private practice of law in Philadelphia. In 1943 he entered the Army and, among other assignments, was commanding officer of Radio, Luxembourg. He was awarded the Legion of Merit (U.S.) and the Legion of Honor (France) and other decorations. He presently holds the rank of colonel in the Army Reserve forces.

specified percentages of the sales price of phonograph records and electrical transcriptions manufactured from master records made by AFM members employed by the signatory companies during the periods covered by the respective agreements.[15] The Trustee is to expend the funds so collected to sponsor free public musical performances by instrumental musicians, whether or not members of AFM, in areas throughout the United States and Canada conforming to the geographical areas in which the various local unions of AFM have jurisdiction.[16] Such performances are to be rendered, without profit to the Trust Funds, on such occasions and at such times and places, in connection with patriotic, charitable, educational, civic and other activities of a general public nature, where no admission fees are charged, " * * * as in the judgment of the Trustee will contribute to the public knowledge and appreciation of music."

The Trust Agreements further provide that the Trustee is to be designated by the Record Companies collectively, and successor Trustees are to be appointed by the Secretary of Labor of the United States. Each Agreement specifically provides that " * * * No Trustee under this agreement shall be a representative of labor, or of any union, or of employees within the meaning of Section 302(b) of the Labor Management Relations Act, 1947." The Agreements further provide that " * * * The Trustee shall not act as a representative of * * * (AFM), or of any member or members

thereof, or of any person or persons receiving payment under the terms of the trust for services rendered at the performances presented pursuant to the terms hereof * * *," and the Trustee is to be guided solely by the terms and conditions of the Trust Agreements and to perform his functions " * * * on the sole basis of the public interest." In the event of the repeal or amendment of the Taft-Hartley Act, so as to make such action lawful, the president of AFM may designate a successor trustee.

The Trust Agreements require the Trustee to engage instrumental musicians in connection with the presentation of the performances required by the Agreements at the union scale in the particular area. They also expressly direct the Trustee, in arranging such performances, to " * * * consult with and receive the counsel and advice of qualified institutions and organizations including business groups and organizations, public authorities, musical schools and institutions, * * * (AFM), and other civic, patriotic, charitable and welfare organizations, and such other persons and organizations as the Trustee shall consider useful and suitable * * *."

Before making any disbursements, the Trustee is required to receive the certification of an AFM representative that services have been received or contracted for, subject to the limitation that such certification shall not be unreasonably withheld. The Trustee must furnish to AFM and the Record Companies semi-

15. The 1948 Agreements cover records and transcriptions sold after September 30, 1948, which are manufactured from masters made between September 20, 1943 and December 31, 1947 and between October 1, 1948 and December 31, 1953. The 1954 Agreements cover records and transcriptions manufactured from masters made or initially released between January 1, 1954 and December 31, 1958. The 1959 Agreements cover records and transcriptions manufactured from masters made between January 1, 1959 and December 31, 1963.

16. Schedule A to the 1948 Agreements allocates various percentages of the funds in the hands of the Trustee to be expended each year in each of these areas. The 1948 Agreements also provide that the Trustee shall expend at least 90% of the funds received by him in accordance with those percentages in each half year, the remaining 10% being held for administrative expenses. The 1954 and 1959 Agreements leave the designation of geographical areas and percentages of expenditures therein to the Trustee. They also provide that 10% of the expenditures need not be allocated to geographical areas at all, but may be expended at such times and places as the Trustee may determine.

annual statements and reports, certified by an independent accountant selected by him.

### (e) The Terms of the Labor Agreements.

Simultaneously with the execution of the Trust Agreements of 1948, 1954 and 1959, each Record Company executed a collective bargaining agreement with AFM covering the manufacture of phonograph records. Generally speaking, the provisions of these Labor Agreements are the same as those in the various agreements between the Record Companies and AFM prior to December 31, 1947, except that the undertakings of the Record Companies to pay percentages of the sales prices of records sold by them to AFM are deleted. Each Labor Agreement recites that one of its considerations, and a condition thereof, is the execution by the respective Record Company of the related Trust Agreement; and it also provides that if the Record Company fails to perform its obligations under the Trust Agreement, or if its performance shall become illegal, then, at AFM's option, the Labor Agreement shall be ineffective during the period of such non-performance or illegality. Under each Labor Agreement, AFM has the right to receive from the Record Company involved copies of the statements furnished by it to the Trustee, showing the basis of its payments into the Trust Funds, and also the right to audit the Record Company's books in connection with such payments.

### (f) The Trustee's Administration of the Trusts.

During the ten-year period since the establishment of the Trusts, the Record Companies have contributed well over $23,000,000 to the Fund. Of this amount, the Trustee has disbursed nearly $16,000,000 in over 1,350,000 payments to musicians for more than 147,000 performances. About $4,750,000 additional has been allocated and will have been disbursed by June 30, 1959. He has also spent over $1,300,000 for administration expenses.

The Trusts are administered from an office established by the Trustee in New York City, the staff of which has consisted of two administrative assistants and sixteen clerks, only one of whom had any previous association with AFM.[17] Since the inception of the trust, Mr. J. Wharton Gootee, the former administrator of the AFM Recording and Transcription Fund, has acted as AFM's designated representative for the purposes of the certifications required by the Trust Agreements. All trust funds are deposited by the Trustee in accounts in Philadelphia, New York and Toronto banks, which are subject to his sole signature.

Upon assuming his duties in 1948, the Trustee considered various methods by which he might most efficiently administer the Trust Funds. He determined that it would not be practical to set up branch offices in each of the areas he was required to serve.[18] In accordance with the terms of the Trust Agreements, he, therefore, sought the assistance of the National Recreation Association, Community Chest, American Red Cross, Kiwanis Clubs, Rotary Clubs, and other business, musical, welfare and educational organizations, but none of these was prepared to assume the burdensome responsibilities attendant upon producing recommendations of worthwhile projects in the hundreds of areas to be served. As provided in the Trust Agreements, he also sought the assistance of AFM. Mr. Petrillo and the International Executive Board of AFM refused to have anything to do with the administration of the Trusts, fearing that AFM partici-

---

17. Initially, the Trustee employed two clerical assistants who had previously worked for the AFM Recording and Transcription Fund. One has since retired. The other remains in the Trustee's employ.

18. In his First Report, the Trustee noted that, of the 654 geographic areas in which the 1948 Trust Agreements required him to make disbursements, 444 received allocations of less than $1,000 and only 12 areas were allocated more than $10,000.

pation would run afoul of the Taft-Hartley Act, but they finally were persuaded by the Trustee to permit the AFM Locals to make recommendations as to projects which the Trustee might sponsor in their respective areas.[19] The method of operation then developed by the Trustee has been as follows:

When the Trustee has computed the amount of the semi-annual allocation to each geographical area required by the terms of the Trust Agreements, he notifies each Local of the amount to be spent in its area, and requests recommendations for projects.[20] A standard recommendation form, supplied by the Trustee, is filled out by the Local and submitted to the Trustee. Each recommendation thus submitted is reviewed by the Trustee and approved by him if it conforms to the terms and purposes of the Trust Agreements. If a recommended project does not meet the standards prescribed by the Trust Agreements, it is rejected by the Trustee.[21]

The recommendations approved by the Trustee are then submitted, in accordance with the terms of the Trust Agreements, to Mr. Gootee for certification by him.[22] To date all projects approved by the Trustee have, in fact, been certified by Mr. Gootee. After certification, the Trustee authorizes each performance by mailing an approved duplicate of the request form to the Local. After the performance, a payroll sheet signed by each performer and attested by the program leader and an officer of the Local is forwarded to the Trustee. The Trustee then mails a separate check to each individual performer.[23] No funds are handled by AFM or pass through the hands of any Local.

As required by the Trust Agreements, the Trustee prepares detailed semi-annual reports of his administration of the Trust Funds, and furnishes copies of these reports to the Record Companies and to AFM. As a matter of courtesy, he also furnishes copies to the AFM Locals and to other interested persons and organizations. The financial statements in these reports are certified by an independent accountant.

As indicated, the issue for determination by this Court is whether or not the Trustee is a "representative of employees" within the meaning of Section 302 of the Taft-Hartley Act. The basic questions presented are: (1) is the Trustee constituted a "representative of employees" by the provisions of the Trust Agreements themselves?; and (2) is the Trustee, in his administration of the Trusts, so dominated and controlled by AFM as to be, in reality, a "representative of employees"? In the opinion of this Court, the language of the statute, the judicial decisions interpreting and applying Section 302 and the legislative history and purposes, when applied to the record in this case, compel the conclusion that neither the provisions of the Trust Agreements nor the Trustee's ad-

19. The Trustee testified that such recommendations were requested from the Locals " * * * on the clear and complete understanding that their sole function was to make recommendations to me * * * and that the sole and final judgment and discretion and control in the administration and expenditure of the Fund remained with me."

20. Projects frequently are recommended by others than AFM Locals. Some, in fact, are initiated by the Trustee himself. In all cases, however, the recommendations are routed through the respective Local in order that the Trustee may have uniform documentation for purpose of internal and external audit.

21. Recommendations have been rejected,

for example, where the program was not open to the public and where the program was to aid a charity drive or was for the benefit of a particular organization, and where the recommended leader or the performers were not considered qualified. The Trustee testified that the number of such rejections has decreased annually because of the increasing familiarity of the Locals with the Trustee's requirements.

22. The Trustee's testimony is to the effect that Mr. Gootee certifies that the Trustee's disbursements are "in accordance with the limitations and purposes of the trust indenture."

23. As of June 30, 1958, $288,146 had been paid to non-AFM musicians.

ministration of the Trusts constitutes him a "representative of employees" within the meaning of the Taft-Hartley Act.

The Act itself provides, in Section 501 (3), (29 U.S.C.A. § 142(3)), that the term "representative" shall have the "same meaning as when used in the National Labor Relations Act as amended by this Act." The pertinent definition is contained in Section 2(4) of the National Labor Relations Act (29 U.S.C.A. § 152 (4)): "The term 'representatives' includes any individual or labor organization."

In United States v. Ryan, 1956, 350 U.S. 299, 76 S.Ct. 400, 403, 100 L.Ed. 335, the Supreme Court authoritatively held that the term "representative" in Section 302 was not limited to the "exclusive bargaining representatives" of employees but was broad enough to include a union president who was also a member of a wage scale committee which represented the union in bargaining with the employer. The Court specifically stated (350 U.S. at page 302, 76 S.Ct. at page 403),

"  *   *   * that in using the term 'representative' Congress intended that it include *any person authorized by the employees to act for them in dealings with their employers*   *   *   * (and) someone in the position of respondent Ryan *who represented employees both as a union president and principal negotiator.*" (Emphasis supplied.)

The Court concluded, after an analysis of the language and legislative history of Section 302 (350 U.S. at page 307, 76 S.Ct. at page 405),

"  *   *   * that § 302 prohibits payments by employers to individuals *who represent employees in their relations with the employers.*" (Emphasis supplied.)

Following the Ryan case, the Court of Appeals for the 8th Circuit, in Brennan v. United States, 1957, 240 F.2d 253, certiorari denied 1957, 353 U.S. 931, 77

S.Ct. 718,. 1 L.Ed.2d 723, approved the following instructions to a jury defining the term "representative" as used in Section 302 (240 F.2d at page 264):

" 'The word "representative" in Section 186 of the National Labor Relations Act and elsewhere in any of my instructions is used in its ordinary everyday meaning and means a labor representative. *As such, it includes any person who is empowered, authorized, or designated in any way, directly or indirectly, by any employee or employees, to represent such employee or employees in any matter relating to their wages or hours or working conditions by standing in the place of such employee or employees in any responsible dealing with the employer involving such matters.*

\*   \*   \*

'Any labor organization, such as a local union, union council, union conference or international union which is empowered, authorized or designated, by any employee or employees to act on his or their behalf in any dealing with the employer with respect to hours, wages or working conditions is by virtue thereof a representative of such employee or employees, *and any individual who actively holds and occupies an office or position of responsibility in any such union local, council, conference, or international, who is empowered or authorized in such office or position to act for any such labor organization in which he holds office in such way as to affect any such employee in a substantial way in any dealing with the employee's employer with respect to hours of labor, wages or working conditions, is thereby also a representative of such employee or employees.' "* (Emphasis supplied.)

Similar interpretations of Section 302 are indicated by the cases of United Marine Division, Local 333, A. F. of L. v. Essex Transportation Co., 3 Cir., 1954,

216 F.2d 410 and Rice-Stix Dry Goods Co. v. St. Louis Labor Health Institute, 15 Labor Cases, para. 64,727 (E.D.Mo. 1948) both decided prior to Ryan. Nor do Sheet Metal Contractors Association of San Francisco v. Sheet Metal Workers International Ass'n, 9 Cir., 1957, 248 F.2d 307, certiorari denied 1958, 355 U.S. 924, 78 S.Ct. 367, 2 L.Ed.2d 354 and Plumbing & Pipe Fitting Labor-Management Relations Trust v. Conditioned Air and Refrigeration Co., 9 Cir., 1958, 253 F.2d 427, establish any broader concept, for in each case the Court specifically found direct participation by union-designated representatives in the administration of the funds involved. In fact, no case construing Section 302 has gone beyond a holding that "representative of employees" means an individual or labor organization authorized by the employees to act for them in dealings with their employers.

By this test, it can hardly be contended that the Trustee is constituted a "representative of employees" by the provisions of the Trust Agreements themselves. By the terms of the Agreements, the Trustee was designated in the first instance by the Record Companies, and not by employees or any representative of employees. Further, the Trust Agreements specifically disqualify a "representative of employees" from serving as Trustee and provide that in carrying out the Trust the Trustee shall not represent labor, or any union, or employees.[24]

Nor does the evidence in this record support plaintiffs' contention that the Trustee, in his administration of the Trusts, is so dominated and controlled by AFM as to be, in reality, a "representative of employees". The Trustee himself is not, and never has been, associated in any capacity with AFM or any labor union or group of employees. In his ad-

ministration of the Trusts, the Trustee has adhered strictly to the provisions of the Trust Agreements and has maintained his complete independence of AFM in the exercise of the discretionary powers given him by the Agreements. The only contacts by the Trustee with AFM have been those compelled by the terms of the Trust Agreements: he has consulted with, and received recommendations from, AFM Locals relating to the presentation of performances; before paying individual performers for services rendered, he has obtained certifications from an AFM representative that such services have been received or contracted for; and he has furnished AFM and its Locals with copies of his semi-annual reports—all as required by the Agreements. The record further conclusively establishes that throughout his administration of the Trusts, the Trustee has exercised his independent judgment free from AFM influence or control, and as specified by the Agreements, has been "guided solely by the terms and conditions" thereof and has performed his functions "on the sole basis of the public interest".

Plaintiffs lay much stress on the legislative history and purposes of Section 302 as indicating the intent of Congress to strike down trust agreements of the type involved in this case. But the legislative history clearly indicates that these Agreements do not contain the vices at which Congress was aiming.

The legislative history of Section 302 shows that it was directed against the establishment of funds exacted from employers and administered by union officials at their unlimited discretion and without any obligation whatever to account. See, e. g., 92 Cong.Rec., Part 4, 79th Cong., 2d Sess., 1946, p. 4893 (Senator Byrd), p. 4897 (Senator Knowland),

24. Although the Opinions of the Solicitor of the Department of Labor and the Attorney General as to the validity of the Trust Agreements under Section 302 (supra, 171 F.Supp. 877, 878) are not binding upon this Court, the Court concurs with the views therein expressed. Cf. The American Shipper (McCrea v. United States), D.C.S.D.N.Y.1932, 3 F.Supp. 184, 185, affirmed 2 Cir., 1934, 70 F.2d 632, affirmed 1935, 294 U.S. 23, 55 S.Ct. 291, 79 L.Ed. 735.

p. 4898 (Senator Ball); S.Rep.No.105, 80th Cong. 1st Sess., 52 (1947); 93 Cong.Rec., Part 4, 80th Cong., 1st Sess., 1947, p. 4678 (Senator Ball), p. 4678 (Senator Byrd), p. 4679 (Senator Pepper), pp. 4746 and 4747 (Senator Taft). As the Supreme Court stated in Ryan, supra, 350 U.S. at page 304, 76 S.Ct. at page 404:

> In 1946 Congress was disturbed by the demands of certain unions that the employers contribute to 'welfare funds' *which were in the sole control of the union or its officers and could be used as the individual officers saw fit.* (Emphasis supplied.)

In the instant case, the trust funds are not subject to the control of the union or its officers; no part of the funds goes to the union or its officers; and none of the funds can be used as the union or its officers may see fit. To the contrary, the trust funds here under consideration are, by the express terms of the Trust Agreements, established by payments to an independent trustee, whose administration of the funds is entirely free from control by either the union or its officers, whose discretion in the expenditure of the funds is carefully circumscribed by the provisions of the Trust Agreements, and whose use of the funds is subject to the strictest obligation to account both to the employers and to the union. The legislative history of Section 302 clearly shows that it was not the intention of Congress to render legally impossible the creation of trust funds, such as here involved, which are wholly free from union domination or control.

It is the conclusion of this Court that neither the Trust Agreements nor the Trustee's administration of the Trusts constitutes him a "representative of employees" within the meaning of Section 302 of the Taft-Hartley Act. Judgment is accordingly ordered for the defendants, with costs.