**GENERAL ELECTRIC COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 29881.

United States Court of Appeals,
Fifth Circuit.

May 18, 1971.

John K. Dunlap, John E. Branch, James Pulm Swann, Jr., Branch & Swann, Atlanta, Ga., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Lynn D. Poole, Atty., N.L.R.B., Washington, D. C., Walter C. Phillips, Regional Director, Region 10, N.L.R.B., Atlanta, Ga., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Washington, D. C., William F. Wachter, Attys., N.L.R.B., Washington, D. C., for respondent.

Irving Abramson, Ruth Weyand, Washington, D. C., Robert Friedman, New York City, for intervener.

Before RIVES, GOLDBERG, and MORGAN, Circuit Judges.

GOLDBERG, Circuit Judge:

This unfair labor practice case concerns wage grievance strikes by a local affiliate of the International Union of Electrical, Radio, and Machine Workers, AFL-CIO, at an electrical equipment manufacturing plant of General Electric Company located at Rome, Georgia. General Electric sought to convince the National Labor Relations Board that the existence of a National Agreement between the I.U.E. and General Electric required a blackout of localized wage negotiations during the term of the agreement. The Board found no such contractual blackout and refused to condemn the Union activity in support of local wage rates. We discern though our prism the same conclusion reached by the Board, and hence we affirm the Board's order dismissing the unfair labor practice complaint.

## I.

General Electric and the I.U.E. have engaged in bargaining on a national level and have been parties to a series of collective bargaining agreements covering many thousands of employees represented by local affiliates of the I.U.E. in plants throughout the country. Of particular relevance are the 1963–1966 and the 1966–1969 National Agreements, covering a period of time commencing September 30, 1963, and terminating October 26, 1969. The particular provisions of these agreements which are involved in this case are common to both contracts, and have been present in several previous agreements between the parties.

Since 1954 the production and maintenance employees at General Electric's Rome, Georgia, plant have been represented by Local 191, an affiliate of the I.U.E. On June 13, 1966, the Local Union filed 101 wage rate grievances with General Electric involving approximately 450 employees who worked on incentive-rated jobs. The Local, contending that the Company's incentive rate was not in line with prevailing wages in the area and that the work involved had become more complex, requested that each of the 450 employees have his incentive rate increased four steps up the wage progression ladder. On May 11, 1967, after the

signing of the new 1966–1969 National Agreement, the Local filed 102 more wage rate grievances with the Company, requesting a four-step increase for hourly-rated jobs on behalf of approximately 500 employees. Together, the two groups of grievances covered approximately 87% of the plant's 1100 employees and 203 of the plant's 216 job classifications.[1]

Both sets of grievances were filed at the second level of the applicable grievance procedure.[2] After prolonged discussion and reference to the national level under Step Three of the grievance procedure, the Company, in October, 1967, rejected all of the grievances. The I.U.E. then selected a group of 10 grievances on which it requested arbitration under the contract, but General Electric declined to arbitrate, relying on Article XV, section 7(e), which excluded wage rate disputes from arbitration except by mutual consent.[3]

Following General Electric's refusal to arbitrate, Local 191 commenced a series of weekend strikes, each lasting one day, and each being prefaced by notice to the Company that the Local was about to strike in support of a particular named wage grievance. In addition to the one-day strikes, other strike action was undertaken, which consisted of selected refusals to work overtime, each refusal again being prefaced by notice.

---

1. In addition, during the 11 month interval between these two major sets of grievances, the Local filed grievances covering three other classifications affecting approximately 12 men.

2. The 1963–1966 and 1966–1969 National Agreements established a three-step procedure for settling grievances. Article XIII provided that grievances of a "general nature" could be initiated at Step Two (Management level), bypassing Step One (Foreman level). Since the foreman obviously had no power to correct the wage disputes in the instant case, exhaustion of Step One was unnecessary. Disputes not resolved at the local level under Step Two were, under the Agreements, to be referred to the national level under Step Three. Certain matters not resolved by the three-step grievance procedure could ultimately be sent to arbitration under Article XV.

3. Article XV, section 7(e), provided:
   "7. All requests for arbitration which are not subject to arbitration as a matter of right under the provisions of Section 6 above, are subject only to voluntary arbitration. In particular, it is specifically agreed that arbitration requests shall be subject only to voluntary arbitration, by mutual agreement, if they

   \*      \*      \*      \*      \*

   "(e) Would require an arbitrator to consider, rule on or decide the appropriate hourly, salary or incentive rate at which an employee shall be paid, or the method (day, salary or incentive) by which his pay shall be determined."

While the strikes were continuing, General Electric filed charges with the Board's General Counsel in May and November, 1968, alleging that Local Union 191 and the I.U.E., through ratification of its affiliates' acts, were refusing to bargain collectively in violation of section 8(b) (3) of the Act, 29 U.S.C.A. § 158(b) (3), in that the strikes were for the purpose of modifying the National Agreements prior to their expiration dates and without proper notice in violation of section 8(d), 29 U.S.C.A. § 158(d). The Board[4] adopted the Trial Examiner's conclusion that the Local Union's action did not constitute an unfair labor practice,[5] and General Electric petitions for review. The Board has made a cross-application for affirmance, and Local 191 and the I.U.E. have intervened in support of the Board.

## II.

Section 8(b) (3) of the Act provides that it shall be an unfair labor practice for a labor organization "to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 9(a)." The general scope of this bargaining obligation is set forth in section 8(d). That section provides in part

"That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

(3) notifies the Federal Mediation and Conciliation service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later * * *."

It is undisputed that Local 191 not only struck in support of the wage grievances during the term of a collective bargaining agreement but also failed to give the requisite notice prescribed by section 8(d). The crucial question, therefore, is whether the Local's strike action was an attempt to modify the applicable national collective bargaining agreements. See Mastro Plastics Corp. v. NLRB, 1956, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309; Local Union No. 9735, UMW v. NLRB, 1958, 103 U.S.App.D.C. 294, 258 F.2d 146. We think that the Board was correct in holding that the Local Union's conduct was not an attempt to modify the existing collective bargaining agreements, but instead was the exercise of activity for a purpose specifically sanctioned by those agreements.

---

4. The Board's decision is reported at 181 N.L.R.B. No. 111 (1970).

5. The Trial Examiner also found that the I.U.E. should not be held accountable for the conduct of the Local since it had not ratified that conduct. The Board found it unnecessary to consider this issue because of its conclusion that the Local's strike action did not have a prohibited purpose.

The present disputes arose under the 1963–1966 and 1966–1969 National Agreements between General Electric and the I.U.E. Article XXVIII of both contracts recited that the Agreement in question was "in full settlement of all issues which were the subject of collective bargaining between the parties in national level collective bargaining negotiations." Pointing to this language, General Electric contends that the wage grievances pressed by Local 191 at the Rome plant were an attempt to reopen settled issues which had been the subject of bargaining at the national level. In doing so, the Company argues, the Local attempted to modify the applicable national agreements.

The Board found, however, that the bargaining history of the parties revealed that local wage rates had not traditionally been discussed at the national level. In support of this finding the Board noted that geographical wage differentials existed among various local plants. Indeed, Article VI, Section 5, of both the 1963–1966 and 1966–1969 National Agreements explicitly recognized this differential:

"The Union and the locals recognize that starting rates and job rates for hourly rated and salaried employees vary, depending on the job, its location and its surrounding circumstances."

The Board and the Trial Examiner concluded, therefore, that it would be inconsistent for the National Agreement to preclude local collective bargaining over local wage rates which were not discussed at the national level, were not nationally uniform, and were subject to local variation. Turning to the contractual language, the Board and the Examiner found explicit provision for local negotiation over local wage rates. After stating that the National Agreement was in settlement of all issues subject to national collective bargaining, Article XXVIII of both the 1963–1966 and the 1966–1969 Agreements continued.

"Consequently, it is agreed that none of such issues shall be subject to collective bargaining during the term of this Agreement and there shall be no strike or lockout in connection with any such issue or issues; provided, however, that this provision shall not be construed to limit or modify the rights of the parties hereto under Article VI, Section 1, and Article XIV of this Agreement."

Article VI, Section 1, provides:

"Any question which affects hourly rates, piecework rates, or salary rates of individuals or groups shall be subject to negotiations between the local and local management."

And, finally, Article XIV, also referred to by Article XXVIII, made it clear that, after exhausting the grievance procedure of Article XIII, a union may strike in support of its bargainable demands, including those demands relating to subjects recognized in Article VI, Section 1:

"1. There shall be no strike, sitdown, slowdown, employee demonstration or any other organized or concerted interference with work of any kind in connection with any matter subject to the grievance procedure, and no such interference with work shall be directly or indirectly authorized or sanctioned by a Local or the Union, or their respective officers or stewards, unless and until all of the respective provisions of the successive steps of the grievance procedure set forth in Article XIII shall have been complied with by the Local and the Union. The foregoing exception will not apply if (a) the matter is submitted to arbitration as provided in Article XV, or (b) 12 months shall have elapsed after receipt by the Union of the Company's final decision on the grievance at Step Three."

General Electric argues, however, that this contractual provision for local collective bargaining over local wage rates during the term of the National Agreement, and strikes in support thereof following exhaustion of the grievance machinery, does not encompass the wage grievances at issue here. This argu-

ment can best be understood by looking to the Company's articulation of it:

"This provision [Article VI, Section 1] has historically been contained in national collective bargaining agreements to reflect the fact that while matters of general increase applicable to all employees in a bargaining unit are negotiated for and contracted for on a national basis, the hourly-rates piecework rates, or salary rates of individuals or of groups within a single bargaining unit may nonetheless be made the subject of local negotiation during the term of the contract.

"This provision or its general equivalent has been in national contracts for more than ten years, and under it, both union and Company representatives have recognized the appropriateness of the union presenting requests for wage rate adjustments of individuals or groups of workers through the grievance procedure with the matter following the usual grievance steps. At the same time, by historical practice, as well as the language of the provision itself, *this section does not permit the raising of a grievance demanding a general wage increase for all employees in a bargaining unit. It is, instead, limited to the rates "of individuals or groups" within a unit.* In effect, the settlement of national negotiations carries with it a general freezing of the basic wage rate schedules in all local plants, subject only to the negotiation of claimed inequities within such schedules.

\*　\*　\*　\*　\*　\*

"Questions involving claimed inequities in the rates of individuals or groups within a plant may be raised under this provision by the local union. In the event such questions are not initially settled to the satisfaction of the union, the resulting dispute or grievance must proceed through the various steps of the grievance procedure. As indicated above however, *demands for general wage increases covering all employees in a bargaining unit may not be made and are not to be considered as within the terms of this provision,* such questions being reserved for national negotiation. (See Article XXVII)"

General Electric, therefore, contends that while local grievances over individual wage rates are permissible, grievances which encompass an "entire plant wage structure" are subject to national negotiation and have been settled by the National Agreement. In support of this position the Company points to the fact that appended to both the 1963–1966 and 1966–1969 National Agreements were Wage Agreements which provided for all General Electric bargaining units represented by the I.U.E. locals: (1) periodic, across-the-board wage increases; (2) cost of living and other similar adjustments; and (3) a "Table of Standard Daywork Step Rates." The existence of these Wage Agreements, General Electric contends, freezes any additional local wage adjustments of plant-wide application. The Board rejected this argument, and we think that it was correct in so doing.

In 1963 and 1966 the wage table listed approximately 40 different basic rates of pay, but did not indicate which class or type of work was to be paid a particular rate. For example, the 1966 agreement listed the lowest rate as $1.525 per hour. The remaining rates were listed in ascending order at intervals which varied in amount between 3.5 cents and 14 cents. The highest rate listed was $4.495.[6]

6. For example, a portion of the 1966–1969 table revealed the following progression:

$ 1.525
1.56
1.595
1.64
\*　\*　\*　\*　\*
4.495

Each job at a local plant is assigned one of the step rates listed on the table, but, as noted, the table itself does not indicate how particular classes or types of jobs at various plants are to be keyed into the table. The evidence shows, and the Board and Examiner found, that local factors determine which step rate is assigned to a particular job at a particular plant. Thus, at the Rome plant, the lowest rate, known as R–8, is assigned to jobs classified as janitorial. That rate of pay is derived from one of the step rates of pay set out in the national wage table. The highest rate paid at the Rome plant is classified R–26, and is assigned a step rate 18 steps further up the table.[7] But the R–8 rate at Rome is not necessarily the same as the R–8 rate paid at other of the Company's represented locations. Nor is the Rome step rate of pay for janitors, or other job classifications, necessarily paid to employees in identical job classifications at other General Electric plants. To determine the step rate of pay for a job at a particular plant, the local wage rate manual must be consulted. The particular wage structure at a particular plant, therefore, is nowhere settled or discussed in the National Wage Agreement.

Since there is nothing in the national agreements which explicitly support General Electric's view that wage bargaining on a plant-wide basis is forbidden, the Company must demonstrate that local wage rates are frozen by implication during the term of the national agreements. General Electric is forced to stand on the proposition that even though local plant management initially sets local rates—usually prior to the unionization of the plant—union-initiated alterations in this plant wage structure are precluded but for the periodic across-the-board percentage adjustments which are negotiated for all plants at the

national level without regard to location or job. To adopt General Electric's contention would be to leave a non-negotiable void in the elaborate machinery created by parties who are no novices in the labor contract field. It is undisputed that local wage claims are not entertained at the national level. General Electric's contractual interpretation would also preclude discussion of local wage claims of plant-wide scope at the local level. The Board found this interpretation unpersuasive, and we agree. Moreover, the National Agreement, rather than supporting the Company's strained interpretation, compels by its express terms the results reached by the Board.

As noted, Article VI, Section 5, recognized that wage rates varied from plant-to-plant and depended upon local conditions; moreover, local collective bargaining over questions affecting the wage rates of "individual or groups" was expressly sanctioned by the National Agreement.[8] In addition, such wage disputes were explicitly exempted from mandatory arbitration. As the footnote to Article XV recognized, local wage rates were arbitrable only upon mutual consent because

"this National Agreement does not set out specific rates or classifications for jobs, and * * * [Article XV is] designed to confirm the intent of Article VI, Section 1, and Article VI, Section 5 (first sentence) that disputes over individual job classifications, rates of pay, incentive standards, etc., are assigned by the parties to local negotiation, and not to arbitration."

To draw a distinction between wage grievances concerning "groups" of individuals and wage grievances involving sufficient numbers of individual em-

7. Thus, when Local 191 in the instant case asked for a four-step increase in wages for various employees in various job classifications, it was simply asking for a movement of four steps up the table of rates.

8. Article XXVIII; Article VI, Section 1.

608

ployees to affect the entire plant wage structure makes sense neither linguistically nor practically. There is no contractual limit on the number of "groups" whose wage rates are subject to local negotiation, and, as a practical matter, wage adjustments for only a few job classifications would of necessity affect the entire plant wage structure. We therefore agree with the Board that the contractual language, rather than supporting a void in bargaining, sustains the conclusion that the parties erected a two-tiered bargaining structure, leaving local wage rates to local negotiation. The national agreements were not preemptive, but instead provided a healthy mechanism for union-management federalism.

Since local collective bargaining over plant-wide wage disputes was sanctioned by the national agreements, the Union conduct in support of those grievances was clearly not for the purpose of modifying the national agreements. Moreover, the strike action by the Local was not even in violation of the contractual no-strike clause since General Electric refused arbitration and since the Local satisfied the grievance exhaustion requirements of Article XIV.[9]

The Board's order dismissing the Company's unfair labor practice charges is therefore affirmed.[10]

9. Of course, even if the strike action had been in breach of the contractual no-strike clause, it would not have entailed a violation of sections 8(b) (3) and 8(d). Since local collective bargaining over local wage rates was sanctioned by the national agreements, a strike in support of local wage rate bargaining demands, even if contractually proscribed, would not constitute an attempt to modify the contracts. Local Union No. 9735, UMW v. NLRB, supra.

10. The Board held alternatively that even if the national agreements by implication prohibited grievances over local wage rates which, if granted, would affect the Rome plant "wage structure," the evidence would nevertheless not support a finding that the Union attempted to modi-

fy the national agreements by its strike activity. In the first place the Board adopted the Trial Examiner's conclusion that the Union demands did not concern a demand for a "general wage increase," but instead only covered several "groups" of employees within the meaning of Article VI, Section 1. Secondly, even if the local Union was implicity proscribed from prosecuting these grievances, there was no attempt to modify the contract since the requested relief—raises to rates set forth four steps up the national wage table—came within the terms of the contract. Since we hold that the Board was correct in concluding that the national agreements themselves sanctioned the Union conduct herein, we need not consider these alternative grounds.